## THE STATE v. FRANK C. RECKE, Appellant.

### Division Two, December 22, 1925.

1. **DEMURRER:** Evidence Considered. In determining whether a case was made for the jury, all evidence tending to support the State's case must be taken as true and every inference which the jury could legitimately draw therefrom must be indulged.

2. ———: Confession: Typewriter Statement: Alteration. Where defendant made and signed a voluntary statement of his connection with the crime, his testimony that such typewritten statement contained statements not actually made by him must be disregarded in passing on the demurrer to the evidence, and it must be assumed that he made every statement contained therein.

3. ———: ———: Connection with Crime: Accessory before Fact. Defendant was business agent of a fixture-hangers union, and his business included endeavors to prevent non-union hangers from working during a strike and to get them to join the union. He had made numerous unsuccessful efforts to get two non-union fixture-hangers to cease working for a certain fixture company and to join the union. While these two non-union hangers were installing an electrical chandelier in a private house situated some distance from the labor temple, four men entered, demanded that they join the union, then that they quit work, and, after threatening that if they did not they must take the consequences, assaulted both of them, and killed the one for whose murder the four and defendant were indicted. The only evidence connecting defendant with the homicide was his typewritten statement made at the

police station the following day, in which he stated that two of the four men came to him and said, "We will go out and run the men off the job;" that he said, "If you can get them off the job that is more than I can do;" that "I then said, 'All right, go ahead;'" that "they told me when they returned that they beat up the two men on the job," and that he "gave the men $22.40, as they told me that there were two other men with them, so that each man received $5.60 apiece." *Held*, that the jury were justified in finding that defendant authorized the two men who came to him at the labor temple, to use whatever force they thought was necessary to run the men off the job, and as he was criminally responsible for all results which should have been reasonably anticipated in executing the commission with which he charged them, it was likewise a question for the jury whether defendant aided, abetted, counseled and encouraged them to assault the two hangers.

4. **ACCESSORY BEFORE FACT: Conspiracy with Two Men: Drawing in Two Others Unknown.** Where defendant, business agent of a fixture-hangers union, whose members were on a strike, authorized two strikers to run two non-union hangers off the job at which they were at work, he is responsible, as an accessory before the fact, if said two strikers employed two others who actually, when the four committed an assault, killed one of such non-union hangers, although defendant did not know the actual murderers. The use by the two strikers, authorized by defendant to run the non-union hangers off the job, of the two others in running the hangers off the job and in assaulting them, was merely the means adopted by the two strikers in bringing about the result authorized and contemplated by defendant, and defendant is responsible for their choice of means for running the men off the job.

5. **MANSLAUGHTER: Instruction: Intent to Kill.** Where the jury may believe from the evidence that the assault by strikers upon the two non-union workers was not committed with intent to kill and was not accomplished with a deadly weapon with a design to cause great bodily injury, and therefore that there was no actual or implied intent to kill, defendant, the business agent of a labor union, who had authorized the strikers to run the workers off the job, and who is being tried for murder as an accessory before the fact, is entitled to an instruction on manslaughter. And especially should such an instruction be given where there is no proof by an eye witness that deceased was struck with anything other than the fists or feet of his assailants, and there is evidence that the assaulting strikers intended to use no more force than was necessary to cause the non-union workers to quit the job at which they were at work.

State v. Recke.

6. ———: ———: **Testimony of Experts: Assault with Fist.** In the absence of direct proof one way or another, the jury are not required to believe the testimony of expert physicians that in their opinion the blows which caused a sliver of a bone to perforate deceased's brain could not have been inflicted with human fists.

7. ———: **Intentional Assault: Accessory before Fact.** There can be an accessory before the fact to involuntary manslaughter, where the intentional assault resulting in unexpected death was not committed suddenly and in a heat of passion.

8. **MURDER: In Second Degree: Instruction: Connecting Accessory with Common Design.** Where defendant, business agent of a fixture-hangers union on a strike, who is being tried as an accessory before the fact in the assault upon non-union hangers and the consequent death of one of them, in that he authorized four strikers to run said non-union workers off a job at which they persisted in working, an instruction for murder in the second degree which does not require the jury to find that deceased was a fixture-hanger working at such job does not sufficiently connect up the common design, and is faulty in that respect; and it is further faulty if it permits the jury to find defendant responsible for the acts of the four strikers who actually committed the assault without requiring that their acts were in furtherance of a common purpose and understanding between him and them.

9. ———: ———: ———: **Connection with Particular Offense: Natural Consequence of Procurement.** In the trial of a defendant as accessory before the fact, the instruction need not restrict the jury to a conviction of defendant of the identical and particular offense which he procured, advised or induced, but may authorize them to convict him of any crime which may have been reasonably anticipated and which in the ordinary course of things was the natural and probable consequence of the crime which he advised or encouraged the principals to commit. Where the evidence tends to establish as a fact that the defendant, business agent of a fixture-hangers union, whose members were on a strike, authorized some of the strikers to run non-union hangers off a job at which they were working, and these strikers made an assault upon the non-union hangers and in the assault one of them was killed, and defendant is being tried for the homicide as accessory before the fact, the instruction on murder in the second degree need not restrict the jury to a finding that defendant encouraged and procured the strikers to commit a mere assault upon the non-union strikers, but may authorize them to convict him of murder where such result may have been reasonably anticipated as the natural and probable consequence of the crime which he encouraged and advised the strikers to commit.

10. **Murder: Evidence: Acquittal of Co-Indictee.** Evidence that one of the principals, jointly indicted with defendant, was upon a separate trial acquitted, is not admissible on behalf of defendant, being tried as accessory before the fact, as tending to establish his innocence.

Corpus Juris-Cyc. References: Criminal Law, 16 C. J., Section 128, p. 135 n. 35, 38; Section 1342, p. 670 n. 63, 64; Section 1556, p. 756 n. 26, 28; Section 3569, p. 223, n. 40, 41, 42 New. Homicide, 29 C. J., Section 38, p. 1067, n. 91; Section 45, p. 1072, n. 52; Section 46, p. 1073, n. 59; p. 1074, n. 60; p. 1075, n. 71; Section 59, p. 1083, n. 39; Section 137, p. 1151, n. 63; 30 C. J., Section 548, p. 302, n. 16; Section 587, p. 333, n. 46; Section 640, p. 394, n. 5; p. 395, n. 8; Section 653, p. 406, n. 17; p. 407, n. 21.

Appeal from Jackson Circuit Court.—*Hon. Thad B. Landon,* Judge.

REVERSED AND REMANDED.

*Bruce Barnett* for appellant.

(1) The demurrer to the evidence should have been sustained. The evidence was insufficient from which to infer that appellant intended any assault to be made upon Rose or any other person. Further, there is no evidence as to which of the four men committed the assault, and appellant had consented that only two of them should go to the Gary residence, and the assault may have been committed by the other two. Certainly he cannot be held to have conspired with two men he never heard of. (2) The demurrer to the evidence having been overruled, there should have been an instruction on manslaughter. The element of malice, present in murder in the second degree and absent in manslaughter, means, when applied to homicide cases, an intent to kill or do great bodily injury or to commit some other felony. Where only a simple or common assault is intended, and death ensues, the element of malice is wanting and the offense is manslaughter only. Little v. Commonwealth, 197 S. W. 516; Ex pare Beshirs, 166 Pac. 73; Turner v. Commonwealth, 167 Ky. 365; People v. Lurie, 266 Ill. 636; People v. Mighell, 254 Ill. 53; McAndrews v. People, 208 Pac. 486; Howard &

Porter v. Commonwealth, 178 Ky. 844. The doctrine of imperfect self-defense, now well established in this State, is cognate to the principle above stated, and is founded upon the same consideration, namely, the difference between a homicide resulting where a felony was intended on the one hand or where a mere misdemeanor was intended on the other hand. It is a question of felonious intent *vel non.* State v. Eastham, 240 Mo. 252; State v. Gordon, 191 Mo. 114, 128. (3) The question is as to the intent of the appellant and not as to the intent of the man who assaulted Rose, whoever that may be. Even though he had committed murder in the first degree, that is to say, even if he had struck with a deliberate intent to kill the intent of the accessory might be to commit a misdemeanor only. The principal might act with malice and even deliberation, and at the same time the element of malice might be absent so far as the accessory is concerned. Brill's Cyc. Criminal Law, secs. 242, 257; State v. Phillips, 118 Iowa, 660; Miller v. State, 139 Wis. 57; Thomas v. State, 73 Fla. 115; State v. Pasnau, 118 Iowa, 501; Hawley v. Commonwealth, 75 Va. 847; State v. Wolf, 112 Iowa, 458; Red v. State, 39 Tex. Cr. 667; Brown v. State, 28 Ga. 199; State v. Smith, 100 Iowa, 458. (4) Instruction 5 on murder in the second degree is without reason or precedent. It tells the jury that if Allee, Mathews, Schultz and Baber, or any of them, assaulted and killed Rose, without referring to whether Rose was a fixture-hanger or whether he was a non-union workman or whether the assault occurred at 1228 West Fifty-sixth Street, and if before such killing this appellant procured and advised said four men, or any of them, to kill any person or persons working as non-union fixture-hangers at 1228 West Fifty-sixth Street, with intent to kill them or to do them great bodily harm, the jury should find appellant guilty of murder in the second degree. The element of causal connection is completely eliminated and the instruction offends against the well-established rule that if the alleged accessory send the principal

forth to kill John and the principal kills James, the accessory cannot be held responsible unless the killing of James was done in an attempt to kill John. Such errors are held to be fatal. State v. Lentz, 184 Mo. 235. (5) The same instruction omits and eliminates the element as to intent upon the part of this appellant. It does not require the jury to find that the act of the appellant in procuring, advising or inducing the others to commit the assault was intentional or willful or premeditated or with malice aforethought. This instruction seems to be predicated upon the theory that the intent of the principals will be imputed to the accessory conclusively and as a matter of law, which doctrine is entirely inconsistent with the modern rule. Cases cited under Point 3. (6) Instruction 6 has the same vices as Instruction 5. It is predicated upon the theory of a conspiracy without requiring the jury to find that appellant intentionally or willfully or with premeditation or malice aforethought entered into the conspiracy, and without requiring the jury to find that the act done was of the nature contemplated or involved in the conspiracy. This instruction speaks of a conspiracy to assault non-union fixture-hangers at 1228 West Fifty-sixth Street and then submits the question as to whether Rose was so assaulted, without requiring the jury to find that Rose was a non-union fixture-hanger and without requiring the jury to find that the assault was made at 1228 West Fifty-sixth Street. (7) From the evidence and from the instructions it appears that appellant is prosecuted as an accessory only, that is to say, that there was no effort to fix responsibility upon him as a principal and no evidence that he was present at the place of the homicide or near enough thereto to aid or abet. Accordingly, he cannot be guilty if the principals are innocent, and the guilt or innocence of each principal is an issue. Therefore one of the issues was as to the guilt or innocence of Mathews, and that issue had been adjudicated. Mathews had been found not guilty and judgment had been rendered accordingly. As to whether the judg-

ment of the acquittal of Mathews was conclusive or merely prima facie is not involved upon this appeal. The error complained of in this regard is that this appellant offered the record of that judgment in evidence and the same was excluded. That the same was at least prima-facie evidence is established by the authorities. Commonwealth v. Minnich, 250 Pa. St. 363; Buck v. Commonwealth, 107 Pa. St. 486; Levy v. People, 80 N. Y. 327. The judgment, either of conviction or of the acquittal of a principal in a prosecution of an alleged accessory, is not only prima-facie evidence and as such admissible, but the same is evidence of exceptional weight.

*Robert W. Otto* Attorney-General, and *J. Henry Caruthers,* Assistant Attorney-General, for respondent.

(1) The evidence was sufficient to raise an issue for the jury. Therefore it was not error to overrule appellant's demurrer at the close of all the evidence. State v. Hembree, 242 S. W. 914. (2) Appellant was shown to be an accessory before the fact by procuring, inciting, advising and encouraging his co-conspirators to get the non-union fixture-hangers at 1228 West Fifty-sixth Street, "off the job," and was, therefore, guilty as principal of the murder of Rose. Sec. 3687, R. S. 1919. (3) The evidence establishes a case of murder, hence appellant was not entitled to a manslaughter instruction. Sec. 3236, R. S. 1919; State v. Stack, 103 Mo. 17; State v. Noeninger, 108 Mo. 170. (4) Appellant's complaint of Instruction 5 is without merit, as it correctly declares the law under the evidence. State v. Rucker, 93 Mo. 91; State v. Dockery, 243 Mo. 596. (5) Instruction 6 correctly stated the law covering the question of conspiracy as applied to the facts in evidence. State v. Hill, 273 Mo. 339; State v. Lewis, 273 Mo. 531. (6) The exclusion as evidence of the acquittal of co-defendant Mathews offered by defendant was not error. State v. Ross, 29 Mo. 39; State v. Sadowski, 256 S. W. 755.

BLAIR, J.—Defendant was jointly indicted with six other persons for the killing of one Julius A. Rose, in Kansas City, on July 2, 1923. The indictment charged murder in the first degree. Defendant was granted a severance. The jury failed to agree upon the first trial. On the second trial he was convicted of murder in the second degree and his punishment was fixed by the jury at imprisonment in the penitentiary for ten years. He has appealed from the judgment rendered upon such verdict.

Defendant was business agent for the Fixture-Hangers Union, the members of which were out on a strike, which began about May 1, 1923. Defendant's business included the duty of endeavoring to prevent non-union fixture-hangers from working during the strike and to get them to join the union. The record discloses that defendant had made numerous efforts to get non-union men to quit work, and had made unsuccessful efforts to get Rose, the deceased, and a fixture-hanger named Carlton C. Olden, to cease working for a fixture company known as "Bailey-Reynolds," and to join the union.

The evidence offered by the State tended to show that on the day of the homicide Rose and Olden were working together at the Hunter L. Gary premises at 1228 West 56th Street, Kansas City. They were installing an electric chandelier in the dining room at said premises, when four men entered the room. They were Allee, Matthews, Baber and Schultz, who were co-indictees with defendant. Allee said to Rose and Olden, "You fellows got a card?" On being told that they had none, Allee said, "Well, how would you fellows like to get off this job?" Rose said, "Why, we wouldn't care to. Why, where are you from?" Alley said, "We were sent out here by the Building Trades Council to see you fellows get off this job or else—" Rose said, "Well, else what?" Allee said, "By God, you take the consequences."

Rose then got off his ladder and stooped over to pick up some glass prisms lying on the floor. Then Allee

said, "Don't pick that up, leave that alone, I mean you."
Thereupon Allee gave Rose a push, which caused him
to fall back on his hands.

About this time Olden got down off his ladder on to
the floor. That was the last he knew for a few moments.
When he regained consciousness he was lying on the
floor. He then saw Rose lying on the floor, and a colored
man bathing his head with water.

One Charles Williams testified that he looked
through a window and saw three or four men, one of
whom appeared to be kicking something on the floor
which he could not see. He then saw the men leave the
house and go down the driveway to the street.

One Homer Faris was cleaning the tile floor of the
pantry. He saw a man strike Olden and saw Olden fall
and then saw some one kick him two or three times. He
did not see anyone assault Rose. He could not identify
the man who struck and kicked Olden.

Rose died within a few moments. Olden's injuries
did not prove serious. The character of the injuries
inflicted upon Rose and Olden were such as to indicate
that the blows they received were not delivered by the
naked fists of their assailants. Rose's death was due to a
perforation of the brain by a sliver of bone which caused
cerebral hemorrhage. Deputy Coroner Moss testified that
in his opinion the injuries to Rose could not have been
caused by a blow from the fist, but admitted that upon a
former occasion he had testified that a blow from the fist
might have caused such injuries.

It appears from the foregoing that defendant was
not present when the assaults upon Rose and Olden were
committed. The theory of the State was that defend-
ant counseled, aided and abetted the four men in commit-
ting the assault. On July 3, 1923, defendant was arrested
and then made a written statement at the police station,
which shows his connection, if any, with the homicide.
A copy of that statement was offered in evidence by the
State and read as follows:

"Frank C. Recke being of lawful age and being first duly sworn upon his oath states:

"My name is Frank C. Recke. I am 46 years of age. I live at 6119 Walrond Ave. I am the business agent for the Fixture-Hangers Union.

"I arrived at the Labor Temple about 8:30 A. M. July 2, 1923. I took a man from the Temple to the Muehlebachs Basewell (Baseball) park, and from the Park I went to the Addick school located at 19th & Woodland Ave. From there I returned to the Labor Temple and there I received a call from some electrician who said that someone phoned in and said that there were two non-union fixture-hangers working on a job at 1226 West 56th St. Someone then said why don't you go and get them son-of-abiches. There were two men there came to me and said 'we will go out and run the men off of the job.' I then said if you can get them off the job that is more than I can do, as I have no one to send out. I then said all right go ahead.

"The men then left the Labor Temple. The next I saw the two men was about noontime. The men told me that they got the two men off. I then said what do I owe you, and one of the men said well it is worth a days (day's) pay. I gave the men $22.40 as the man told me that there were two other men with them, so that each man received $5.60 apiece. After paying the men I left them. Just before leaving them they said if you have any more jobs let us know and we will run them off.

"They told me when they returned that they beat up the two men on the job. I left the Temple about 12:30 P. M. and tended to my business affairs. I returned to the Temple about 5:00 P. M. I was told by some one there that a reporter was looking for me. I then left the Temple and got into my car and drove out to my home. When I reached my home, my oldest boy, Frank, said to me that one of the Bailey-Reynolds men was killed today.

"This statement which I am now making at Detective Headquarters is the truth, no promises or threats being made to me while making this statement.

"(Signed) FRANK C. RECKE."

Defendant was a witness in his own behalf. His testimony tended to show that he had been active in endeavoring to keep non-union men from working during the strike without special permits and to persuade non-union men to quit working and to join the union. He had visited both Rose and Olden, among others, prior to July 2nd. On the morning of that day he had been engaged about his duties at the Labor Temple and elsewhere. He returned to the Labor Temple about 9:15 A. M. and met Baber who asked him how things were going: He asked defendant if he ever got the Bailey-Reynolds people to come in. Defendant said he had not. They had promised to do so, but he had about given them up. Baber then said that these men were then working out on 56th Street and suggested that defendant had not gone at them right. After some more conversation Baber suggested that defendant send someone else to see these men and suggested that he might do some good by going himself. Defendant then said to Baber. "Well, if you want to try them, you are a pretty good talker, may be you can handle them better than I can." Baber agreed to go. Defendant then said, "All right, if you want to try go out and talk to them." Baber then said that he would ask Billy Matthews to go with them. Defendant said, "Well, all right, what kind of a fellow is he?" (Matthews was one of the men indicted for the homicide). Defendant said that he knew him only by seeing him around the Labor Temple. Baber vouched for Matthews. Defendant testified that he cautioned Baber not to use any rough talk to the men and not to call them "scabs" because non-union men hated that word. Defendant said he never saw Baber afterwards and that the next time he saw Matthews was at the jail. He had never seen Schultz until he saw him at the police station and never met Allee until about two weeks after he was

arrested. Of the four men Baber was the only one defendant knew before the homicide.

Defendant testified that he voluntarily made a written statement at the police station on the day following the homicide. He said the officers treated him well. However, he denied making several statements appearing in the typewritten statement offered by the State. He said that his statement was first written in pencil by one of the officers and that he then corrected it in several respects. It was then taken away and copied on the typewriter by a young man named Newman. Several copies were brought back and one of them was read to him and he signed all of them. The copy read to him correctly embodied the pencil draft after he had directed changes to be made in it. While he signed several copies, he did not compare them with the one read to him, because he assumed they were all alike. The inference to be gathered from his testimony is that all of the copies signed by him were not alike and that the one produced in court was not the one read to him, or if it was, that it was not correctly read to him.

Defendant declared that several things appearing in the statement offered in evidence had been stricken out of the pencil draft and were things he did not say. He did not say the men were intoxicated. However, this does not appear in the statement itself. He denied saying that he had paid the men $5.60 each. The pencil statement said something about sons-of-bitches and he had that stricken out. He said that the statement which was read to him made no reference to running the men off the job. He admitted his signature to the two copies of the statement put in evidence.

In rebuttal the State offered testimony that the statement signed by defendant and offered in evidence was the same statement made by him at the police station and that all the copies were identical.

Defendant testified that he bore no ill-will toward Olden or Rose, and had never quarrelled with them, and that when he consented that Baber and Matthews should

go and talk to these men he did not intend that they should use violence or engage in an assault upon them. He had no knowledge whatever that Schultz and Alley were going with Baber and Matthews. He admitted that, when he heard of the death of Rose, he feared that he would be implicated because of the fact that he had sent these men out where they were working to get them to quit working.

I. The first question for disposition is the contention that no case for the jury was made out by the evidence. In determining this question all evidence in the record tending to support the State's case

Accomplice:
Demurrer.

must be taken as true and every inference which the jury could legitimately draw therefrom must be indulged.

The only evidence connecting defendant with the homicide was his typewritten statement made at the police station the following day. In passing upon the demurrer we must disregard defendant's testimony that such typewritten statement contained statements not actually made by him and must assume that he made every statement contained therein. That part of the typewritten statement most damaging to defendant is as follows:

"There were two men there came to me and said 'we will go out and run the men off the job.' I then said if you can get them off the job that is more than I can do, as I have no one to send out. I then said all right, go ahead."

For the purposes of the demurrer, it must be taken as true that defendant authorized Baber and Matthews to go to the Gary premises and run off the job men working there, who were Rose and Olden. Not only must that be assumed, but also the defendant fully approved of the report that his agents had "beat up the two men on the job," for he paid the men for their efforts in that behalf with knowledge of what they had done, as appears by the statement. Defendant con-

spired with Baber and Matthews, at least "to run the men off the job." Baber and Matthews certainly were authorized by defendant to take any measures which defendant reasonably would have expected them to employ to run the men off the job. Defendant had exhausted argument and persuasion. The jury was justified in finding that defendant authorized Baber and Matthews to employ first argument and persuasion and, if that course proved unavailing, then threats and whatever force they thought necessary in order to execute their commission to run the men off the job. Defendant's testimony that he cautioned Baber not to call the men "scabs" or to get rough with them must be disregarded in passing upon the demurrer. To run the men off the job might or might not require physical violence.

One or more of the four men made an assault upon Rose. Defendant was criminally responsible for all results which should have been reasonably anticipated in executing the commission with which he charged Baber and Matthews. It was a question for the jury under the facts and circumstances in evidence whether defendant aided, abetted, counseled and encouraged them to assault Rose and Olden.

But defendant contends that he was not responsible for acts done by Schultz or Allee, men whom he did not know and did not authorize to run the men off the job, and that there is no evidence tending to show which one of the men committed the assault. The obvious answer to this is that the use of Schultz and Allee by Baber and Matthews in running the men off the job and in assaulting them was merely a means adopted by Baber and Matthews in bringing about the result contemplated by defendant, that is, to run the men off the job, and defendant is responsible for their choice of means. If the assault upon deceased was committed by Schultz or Allee, men selected by Baber and Matthews, and such assault was committed in carrying out the common plan or purpose agreed upon by defendant on the one side and Baber and Matthews on the

other, defendant is criminally responsible. The trial court properly overruled the demurrer to the evidence.

II. No instruction upon manslaughter was given to the jury. This was error. Assuming that defendant is answerable for everything done by Baber and the other men, one of whom assaulted Rose, yet he could not be guilty of a higher degree of homicide than that of which they were guilty. The jury might not have believed that the assault upon Rose was committed with intent to kill or was accomplished with a deadly weapon with a design to cause great bodily injury. An intent to kill, either actual or implied, is essential to murder. If Rose's assailants had no intention to kill him, but only to assault him with fist blows and did not intentionally strike him with a deadly weapon at a vital part of the body, then their offense was not murder, but manslaughter. Section 3236, Revised Statutes 1919, reads as follows:

*Manslaughter: Instruction.*

"Every killing of a human being by the act, procurement or culpable negligence of another, not herein declared to be murder or excusable or justifiable homicide, shall be deemed manslaughter."

There was no proof by eye witnesses that Rose was struck with anything other than the fists or the feet of his assailants. In fact the evidence that Rose was assaulted by one or more of the four men is entirely circumstantial, although the inference that at least one of them assaulted him is very strong. Physicians testifying as experts gave it as their opinion that the blows could not have been inflicted by human fists. In the absence of direct proof upon the point one way or the other, the jury was not required to believe such expert testimony. The jury could well have given little weight to the testimony of Dr. Moss upon the point because of his admission that, upon a former occasion, he had admitted that the injuries to Rose might have been caused by a blow from the fist.

In Kelley's Criminal Law and Procedure (3 Ed.) sec. 49, it is said that there can be no accessory before the fact in manslaughter because the offense is sudden and unpremeditated. That statement is necessarily limited to voluntary manslaughter. It has no application to involuntary manslaughter where the act resulting in unexpected death, such as an intentional assault, was not committed suddenly or in heat of passion. [Kelley's Criminal Law & Procedure (3 Ed.) sec. 512; Goff v. Prime, 26 Ind. 196, and Hogan v. State, 10 Ohio St. 459, cited by Mr. Kelley.]

III. Instruction 5 is assailed. It told the jury to find defendant guilty of murder in the second degree if it found that Schultz, Matthews, Allee and Baber or any one of them wilfully, premeditatedly and of their malice aforethought, etc., struck, knocked, hit, beat and wounded Rose, resulting in his death, etc., if defendant Recke procured, incited, advised and encouraged said Schultz and others, or any one of them, "to assault with intent to kill or to do great bodily harm to any person or persons working as non-union fixture-hangers, at 1228 West 56th Street. One criticism is that the instruction did not require the jury to find that Rose was a fixture-hanger working at such premises. The instruction appears to be faulty in this respect. It did not sufficiently connect up the common design with the result. It also permitted the jury to find defendant responsible for the acts of Schultz and Allee, without requiring a finding that their acts were in furtherance of a common purpose and understanding between defendant and Baber.

Said instruction is also criticized because it did not require the jury to find that defendant wilfully, premeditatedly or with malice aforethought procured, advised or induced Baber and others to commit the assault upon Rose. In other words, it is contended that defendant may only be convicted of the identical offence which he procured, advised or in-

*Common Design.*

*Identical Crime.*

duced Baber and others to commit and cannot be guilty of a crime committed which was not contemplated by defendant, although such consequence might reasonably have been anticipated.

The rule is aptly stated in 16 Corpus Juris, p. 135, sec. 128 (4):

"It is well settled, however, that he need not necessarily have intended the particular crime committed by the principal; an accessory is liable for any criminal act which in the ordinary course of things was the natural or probable consequence of the crime that he advised or commanded, although such consequence may not have been intended by him. . . . *Where a particular intent is requisite to constitute a crime, an accessory before the fact must have participated in that particular intent.*" (Italics ours.)

Of the cases cited by defendant in the supplemental brief, State v. Thompson, 238 S. W. (Mo.) 115, and State v. Hickam, 95 Mo. 322, were charges of assault *with intent to kill* and come within the rule stated in the italicized portion of the above quotation from Corpus Juris. In State v. Porter, 207 S. W. (Mo.) 774, and State v. Stemmons (cited as Hartman), 262 S. W. (Mo.) 706, the defendant had no knowledge that his co-defendant intended to make an assault of any kind and the death resulted from such unexpected assault. In State v. May, 142 Mo. 135, the conspiracy, if any, was to assault deceased with fists, and the co-defendant assaulted him *with a deadly weapon* without the knowledge or consent of defendant. Obviously, these cases lend no support to the contention defendant makes in the case at bar.

Instruction 5 required the jury to find that Schultz and others, wilfully, premeditatedly and of their malice aforethought, made the assault, and that defendant procured, incited, advised and encouraged them to make the assault with intent to kill or to do great bodily harm. We think the last criticism mentioned is devoid of substantial merit.

Instruction 6 is said to offend in the same particulars. That instruction required the jury to find that what Schultz, Matthews, Allee and Baber, or either of them, did was done "in prosecution of said conspiracy, agreement or common design, and according to the common purpose thereof." We think this clause, which is not found in Instruction 5, made it necessary for the jury to find that Rose was a non-union fixture-hanger working at 1228 West 56th Street, Kansas City, Missouri, before the defendant could be held liable for the acts of Baber and the other men. Also, if the act of any one of them in assaulting Rose was done in prosecuting the common purpose and design to which defendant was a party, Instruction 6 would not appear to be subject to the criticism that it made defendant liable for the act of one with whom he was not engaged in a common design and agreement.

IV. Defendant complains of the action of the trial court in refusing to admit in evidence the record of the judgment upon a verdict finding Matthews not

Acquittal of Co-Indictee. guilty. 16 Corpus Juris, p. 670, sec. 1342, states the rule thus:

"Evidence of the acquittal of one jointly indicted with defendant is not admissible on behalf of defendant as tending to establish that he also is innocent, and this is true even though the evidence tends to show that defendant on trial was an accessory before the fact, where the statute has abolished the distinction between principal and accessory." [See also State v. Ross, 29 Mo. l. c. 39, and State v. Sadowski, 256 S. W. (Mo.) l. c. 755.]

V. Other contentions made in the brief are of such a character that they will not likely occur upon another

Other Assignments. trial, and we therefore deem it unnecessary to lengthen this opinion further in their consideration.

For the errors above pointed out, the judgment is reversed and the cause remanded for another trial. All concur.