THE STATE v. C. O. FRAZIER, Appellant.—98 S. W. (2d) 707.

Division Two, November 17, 1936.

*Lawrence E. Tedrick* for appellant.

*Roy McKittrick*, Attorney General, *William W. Barnes* and *Wm. Orr Sawyers*, Assistant Attorneys General, for respondent.

ELLISON, J.—The appellant was convicted of manslaughter and his punishment assessed at a fine of $400 and six months in the county jail, for the killing of Daniel I. Gross in Fredericktown in August, 1934. The cause was tried in St. Francois County on change of venue from Madison County. The deceased was a hemophiliac, or "bleeder." The appellant struck him on the jaw once with his fist. A slight laceration on the inside of the mouth resulted which produced a hemorrhage lasting ten days and ending in death. The State's evidence showed the appellant's assault upon the deceased was unprovoked. The evidence for the appellant was that he acted in self-defense; and his theory further was that Gross's death was not caused by the blow struck but by his disease, aforesaid, and the failure to treat it properly. Other assignments in appellant's motion for new trial and brief in this court challenge the information and the overruling of his plea in abatement thereto, the sufficiency of the evidence and the overruling of his demurrers thereto; and complain

of the admission of evidence, the giving of instructions, and the failure to instruct the jury properly.

For the State two eyewitnesses testified. One of these was Mr. E. D. Anthony, city attorney of Fredericktown, a man seventy-eight years old. By him it was shown that the deceased was standing at the outer edge of the recessed entrance to his book and magazine shop in Fredericktown a little before noon on August 31, 1934, when the appellant from a point further west rapidly crossed the street diagonally to the other side and thence, after a very short interval, returned at a brisk pace walking straight up to where the deceased was standing and with his right hand hit him on the left side of the jaw. At that time the witness was about twenty feet away on the adjacent sidewalk. The deceased retreated into his store, the appellant following and striking at him. The deceased said, "don't hit my face, you hurt me." By that time the witness was passing in front of the door within six or eight feet of the two men. The deceased grabbed a book from the table and said, "Get out of here—get out." The appellant turned around and went out. During the whole time the appellant did not say a word so far as the witness heard.

The other eyewitness was Mr. E. H. Bess, hardware and furniture merchant for thirty years in Fredericktown. He was walking on the other side of the street, which was fifty feet wide, about opposite the deceased's store. Glancing up he saw the appellant walk real fast toward the deceased, who was standing at the edge of the entrance to his shop, and hit him with his fist on the left side of the jaw, and then turn away and walk down the street. The deceased staggered back into the building and did not hit the appellant. The witness did not hear either of them say a word, and only one blow was struck.

For the defense two young women who were eyewitnesses referred to the occurrence as a "fight." They testified the appellant and the deceased were scuffling on the sidewalk in front of the shop; that the appellant started to leave and the deceased followed him four or five steps and hit him on the head with a book whereupon the appellant struck the deceased and walked away. The two girls were on the same sidewalk about 100 feet west of the shop when they first observed the difficulty. They did not see Mr. Anthony, the State's witness, who would have been between them and the struggle if all were positioned as they testified. Mr. Anthony on rebuttal declared the two girls were not anywhere in sight on that side of the street at the time.

The appellant swore he did cross the street diagonally as Mr. Anthony testified, and that the deceased, who was standing in the doorway of his shop, called out and cursed him. Appellant thereupon came back and walked up to the deceased, asking what was the matter. The deceased assaulted him. Appellant warded off the blows and pushed the deceased back. The deceased took off his glasses, renewed

the attack, and then, uttering foul epithets, retreated into the store and got a book. Appellant started away, the deceased followed and hit him with the book, and appellant hit the deceased an ordinary blow in self-defense. He swore he did not know the deceased was a hemophiliac.

Regarding the evidence showing the physical condition of the deceased and the effect upon him of the blow struck by the appellant. He was thirty-six years old and had been afflicted with hemophilia since birth. He had been under treatment for that disease about two years before when he bumped his knee on a table, and was in the Veterans' Hospital in St. Louis for a short time. He was below the average in height and overweight, or fat, as some of the witnesses said, and rather pale or anemic. He walked with a slow draggy or hobbling gait.

The two young women aforesaid who were called as witnesses by the appellant testified that after the difficulty had ended they walked on by the shop and saw the deceased standing in the doorway spitting out a little blood. R. O. Buzbee, deputy sheriff, said he had occasion about noon that day to go to the deceased's shop, and found him standing inside the door. He was bleeding from the mouth and his jaw was puffed up and discolored. Mrs. F. T. Gross, mother of the deceased, said she saw him that night about six o'clock. His face, jaw and lips were swollen. His lip was in very bad condition. He went to bed about eight-thirty or nine o'clock that night, but remained in bed only over night, taking care of himself. He was confined to his bed in his last sickness from September 5, five days later, and died on September 10. One of the defendant's witnesses testified to seeing him at a picnic in Fredericktown on Labor Day, which was September 3. He was standing by one of the booths.

Dr. W. H. Barron, a physician at Fredericktown of thirty years' practice, treated him in his last illness. He had known him for fifteen years and intimately for six or eight years, having been his physician on the occasion of his illness two years before. The deceased came to his office in the morning of September 1. His left jaw was badly swollen. An examination disclosed that he had an abrasion or laceration on the inside of his lip. It was an opening in the mucous membrane about one-eighth inch deep, but did not cut into the muscular tissue. The wound was bleeding slowly but not excessively. His face was swollen and rather pale. The doctor did not treat him on this occasion.

Three or four days later the mother of the deceased called at the doctor's office and the latter prescribed treatment for him which included rest in bed, quietude, light foods, cold packs on the face and a drug called ergot. The doctor did not see the patient on this occasion. Several days later on September 8 Dr. Barron was called

to see the deceased in the latter's home. The swollen condition of his jaw was about the same and he was pale and weak. Lots of blood was coming from the mouth and also from the intestines and kidneys. He was expectorating clots of blood coming from the abrasion in his lip. Part of this blood was swallowed and going into the intestinal tract. The patient was vomiting some. On September 10 the doctor was called to the deceased's bedside again. The pallor in his face was more marked and he was going into a state of coma. The pulse at the wrist was barely perceptible. He could not expectorate and the blood from the wound was going into his throat. He died in half an hour.

Dr. Barron gave it was his professional opinion that the death of Gross was caused by hemorrhage from the laceration in his mouth, the latter appearing to be the result of some sort of violence. He described hemophilia as an hereditary condition of the blood such as prevents coagulation thereof and thereby permits hemorrhages to continue unchecked. He further said these hemorrhages could occur spontaneously, without violence, but were usually more aggravated when resulting from trauma. It was his opinion that the injury to the left jaw of the deceased would not have caused him to bleed to death if he had not been a hemophiliac. He said the disease was incurable but that there were treatments for it. The treatments he prescribed were recognized, he said. On cross-examination he was asked if eminent medical authorities did not advise blood transfusions for hemophilia, and was shown one recent text on the subject. The witness answered that medical opinion on that question was not settled, and that he considered a transfusion ill-advised, in view of the patient's condition and environment when he saw him on September 8.

He was asked if he did not find the patient was bleeding rather freely from the kidneys on September 8 and 10, and he answered that he did not see that, but understood it from the history of the case given to him. He found no evidence of any violence to the body in the region of the kidneys or in the intestinal region, but said that some of the blood from the patient's mouth trickled down into the intestinal tract. He was then asked his opinion as to whether the hemorrhage that caused the death of Gross was from the intestines, the kidneys or the mouth and he answered it was the continuous hemorrhage that caused the death, but that he did not know whether it was from the intestinal regions, the kidneys or the mouth. On redirect examination he said large quantities of blood swallowed by an individual would go through the alimentary canal and intestinal tract and be thrown off by the normal action of the latter, and the mere fact that a person might pass blood would not be an indication of bleeding at the kidneys. But he repeated on recross and redirect

examination that without making a test, he could not determine where the blood came from; and that he made no such tests and found no symptoms indicating a hemorrhage of the kidneys except from the case history. Other facts will be noted as necessary in the course of the opinion.

■ I. Appellant's first assignment in his motion for new trial and brief is that the amended information filed by the prosecuting attorney is fatally defective and that the court erred in refusing to sustain his motion to quash the same for four reasons. This makes it necessary to set out the information, which was as follows:

"Now comes Melvin Englehart, Prosecuting Attorney within and for Madison County, Missouri, and by leave of Court first had and obtained, files this, his first amended information, and on his oath of office informs the Court that C. O. Frasier (whose full Christian name is to this Prosecuting Attorney unknown), on or about the 31st day of August, 1934, at and in the County of Madison and State of Missouri, with force and arms in and upon one Daniel I. Gross, feloniously, wilfully, premeditately and of his malice aforethought, did make an assault; and the said C. O. Frasier with his fists, then and there feloniously, wilfully, premeditatedly and of his malice aforethought, did beat and strike to, at, and against and upon the head and body of the said Daniel I. Gross; and the said C. O. Frazier with his fists aforesaid, used as aforesaid, by the said C. O. Frazier, beating and striking as aforesaid, feloniously, wilfully, premeditatedly and of his malice aforethought, did beat and strike the said Daniel I. Gross, in and upon the head of the said Daniel I. Gross, then and there, with his fists as aforesaid, by the said C. O. Frazier, in and upon the head and body of the said Daniel I. Gross, inflicting mortal wounds, from which mortal wounds the said Daniel I. Gross on the tenth day of September, 1934, at the County of Madison, did die. And so the Prosecuting Attorney aforesaid, upon his oath aforesaid, does say that the said C. O. Frazier, in the manner and in the form and by the means aforesaid, feloniously, wilfully, premeditatedly and of his malice aforethought did kill and murder; against the peace and dignity of the State."

It is contended the information wholly fails to state facts sufficient to charge second degree murder; and that it did not inform the appellant of the nature and cause of the accusation. We do not agree with appellant. True, the information is not a model. It spells the appellant's name "Frasier" twice in the opening lines, misspells the word premeditatedly and is repetitious. But it contains enough to charge that the appellant at the county of Madison and State of Missouri committed an assault upon the deceased; and with his fist feloniously, willfully, premeditatedly and of his malice aforethought beat and struck the deceased upon the head, thereby inflicting mortal

wounds from which the deceased died ten days thereafter. [State v. Burns, 99 Mo. 471, 473, and 542, 12 S. W. 801, and 13 S. W. 686; State v. Turlington, 102 Mo. 642, 651, 15 S. W. 141, 143; Ex parte Keet, 315 Mo. 695, 287 S. W. 463; State v. Kaner, 338 Mo. 972, 93 S. W. (2d) 671, 673.]

It is further contended in this connection that the omission of the words "did kill and murder" from the original information rendered it so completely defective that it could not be amended by the filing of the aforesaid first amended information on which the cause was tried. This point was not raised in appellant's plea in abatement or motion for new trial. But without stopping to consider whether the point is preserved and before us, it is sufficient to say that for the last ten years the rule has been settled in this State that the omission from an indictment or information for murder of the formal common-law conclusion is not of itself a fatal defect. [Ex parte Keet, 315 Mo. 695, 287 S. W. 463; State v. Glass, 318 Mo. 611, 615, 300 S. W. 691, 692.]

The fourth point under this head is that the information and all subsequent proceedings at the trial were void because the appellant was not accorded a valid preliminary examination. The contention that the preliminary hearing was invalid is, in turn, bottomed on the proposition that the affidavit filed before the magistrate as a basis therefor was made by a complainant who had no actual knowledge of the commission of the crime charged and was not competent as a witness to prove the same. In support of the allegations of fact in the plea in abatement the appellant adduced evidence at the trial establishing without contradiction that the affidavit was made by W. W. Kemp, sheriff of Madison County; and that he had no knowledge of the homicide except such as he obtained by hearsay from the deceased and others. It appears that he did not testify at the preliminary hearing.

This assignment is without merit. The affidavit was unconditionally sworn to, not simply verified on information and belief; and this was held to be sufficient in State v. Layton, 332 Mo. 216, 221, 58 S. W. (2d) 454. The statute, Section 3467, Revised Statutes 1929 (Mo. Stat. Ann., p. 3110), merely provides that "whenever complaint shall be made, in writing and upon oath, . . ." the preliminary hearing shall be held. Appellant refers us to 16 Corpus Juris, section 504, page 292, which says: "In some jurisdictions the complaint or affidavit must state the facts on complainant's positive knowledge; where it states them upon hearsay or upon information and belief, a warrant cannot be issued;" and among the cases cited in support of the text are State v. Hayward, 83 Mo. 299, and State v. Downing, 22 Mo. App. 504. However, an examination of these decisions will show they dealt with a different statute, Section 1762. Revised Statutes 1879, now Section 3504, Revised Statutes 1929 (Mo. Stat. Ann., p.

3126), prescribing requirements for the making and verification of informations filed for the prosecution of offenses in the trial court. That statute does say the information shall be verified by the oath of the prosecuting attorney, "or by the oath of some person competent to testify as a witness in the case." But the verified complaint to be filed under Section 3467, the statute here involved, does not constitute the formal charge for a prosecution. It merely launches the preliminary examination held to determine whether the accused shall be bound over or committed for trial, and the statute does not require that kind of complaint to be made by a person having first-hand knowledge.

II. Appellant complains further that the proof was insufficient to support the verdict against him because all the evidence showed: (1) that he struck in self-defense; (2) and that the death of Gross was caused solely by the disease of hemophilia, and not by the blow struck. Appellant is entirely wrong in saying all the evidence shows he acted in self-defense. The testimony of two eyewitnesses, Messrs. Anthony and Bess, was that he walked rapidly up to Gross and hit him before a word had been spoken or a demonstration made by Gross. But it is true the undisputed evidence establishes that appellant struck only a single, moderate blow with his fist against Gross's jaw, which was not calculated to produce death or great bodily harm.

Dr. Barron, the attending physician, gave it as his professional opinion that the death of Gross was caused by hemorrhage from the laceration in his mouth, and the evidence is clear that the laceration was produced by the blow struck by appellant. But it was the doctor's further opinion that the blow on the jaw would not have caused the deceased to bleed to death if he had not been a hemophiliac. He also testified the hemorrhages from hemophilia might occur spontaneously, and admitted that he had learned the patient was bleeding rather freely from the kidneys, and, it seems, also through the intestinal tract, during the last three days of his sickness. He made no examination of these parts and the foregoing information came to him only as it was communicated with the case history. He found no evidence of violence in the region of these organs, and stated blood from the wound in the mouth when swallowed might find its way into the intestines. He also said the mere fact that a person might pass blood would not be an indication of bleeding at the kidneys. And yet the record shows that when asked on cross-examination whether the hemorrhage that caused Gross's death was from the intestines, the kidneys or the mouth, he said he did not know; and he also said that without making tests he could not determine where the blood came from.

This somewhat equivocal testimony from Dr. Barron seems to leave the way open for a possible inference that hemorrhages starting

spontaneously in the kidneys and intestinal tract, and being wholly independent of the hemorrhage from the laceration in the mouth of the deceased, may have caused his death. But, on the other hand, the doctor affirmatively expressed the opinion as a physician that Gross's death was caused by the hemorrhage from the laceration in his mouth (which, in turn, was caused by the blow he received) and he further said the passage of blood through the organs of elimination might occur because the blood had been swallowed. It is therefore clear there is no foundation for appellant's contention that *all* the evidence showed Gross's death was caused solely by hemophilia. And for the reasons just stated we are further of the opinion that the doctor's testimony was not so equivocal as to be self-destructive and make it impossible for a jury to find whether the deceased died from the hemorrhage in his mouth or from a different hemorrhage independently starting in his kidneys and intestinal tract. The more natural construction of what he said, it seems to us, is that while he could not be sure without making certain tests which he did not make, yet his professional opinion was that Gross's death resulted from the hemorrhage in his mouth. His opinion as an expert on the question was competent and substantial evidence, and absolute certainty was not required of him. [29 C. J., sec. 640, p. 544, sec. 735, p. 640; sec. 758, p. 644; Kimmie v. Terminal Railroad Assn., 334 Mo. 596, 603, 66 S. W. (2d) 561, 564; Gillick v. Fruin-Colnon Const. Co., 334 Mo. 135, 141, 65 S. W. (2d) 927, 930.]

Remembering the appellant was convicted of manslaughter, two questions remain: (1) was it an adequate defense that the appellant did not know the deceased was a hemophiliac, and struck only one moderate blow with his fist, which ordinarily would not have been dangerous to life; (2) is he to be excused because the blow producing the hemorrhage would not have resulted fatally if deceased had not been a hemophiliac? Both these questions must be answered in the negative. Section 3988, Revised Statutes 1929 (Mo. Stat. Ann., p. 2793), provides that "every killing of a human being by the act, procurement or culpable negligence of another, not herein declared to be murder or excusable or justifiable homicide, shall be deemed manslaughter." If one commits an unlawful assault and battery upon another without malice and death results, the assailant is guilty of manslaughter although death was not intended and the assault was not of a character likely to result fatally. [29 C. J., sec. 137, p. 1150, 13 R. C. L., sec. 89, p. 784; State v. Recke, 311 Mo. 581, 595, 278 S. W. 995, 998.]

Neither is it an excuse that appellant did not know the deceased was a hemophiliac, and that death would not have resulted but for that affliction. On this point 13 Ruling Case Law, section 55, page 750, says: "The law declares that one who inflicts an injury on an-

other and thereby accelerates his death shall be held criminally responsible therefor, although death would not have resulted from the injury but for the diseased or wounded condition of the person so injured." And the doctrine is more fully set out in 29 Corpus Juris, section 57, page 1082, as follows: "If the deceased was in feeble health and died from the combined effects of the injury and of his disease, or if the injury accelerated the death from the disease, he who inflicted the injury is liable, although the injury alone would not have been fatal. The same rule applies, although the disease itself would probably have been fatal, if the injury accelerated death. It is immaterial that defendant did not know that the deceased was in the feeble condition which facilitated the killing, or that he did not reasonably anticipate that his act would cause death." [See, also, 51 L. R. A. (N. S.), 877, note; Ann. Cas. 1916C, 693, note; 16 Ann. Cas. 578, note; 4 Ann. Cas. 958, note.]

III. The sixth assignment in the motion for new trial charges error in the reception of evidence: in the admission of a photograph of the front of deceased's bookshop; in permitting witness Anthony to testify in rebuttal concerning certain distances from said bookshop to other points; and in admitting certain evidence tending to show the appellant fled from Fredericktown very soon after the assault on the deceased. These assignments are abandoned in the brief, and properly so. Both the motion for new trial and brief complain of the State's cross-examination of the appellant. The brief cites pages 126-129 of the bill of exceptions, but reference to these pages shows they cover only the appellant's direct examination by his own counsel. The motion for new trial charges that the appellant was cross-examined concerning an alleged account due him from the deceased, when he had not testified on that matter in chief. But the appellant in chief did say he had no ill feeling for the deceased but that the deceased was mad at him because he had refused to become a witness for the deceased in a certain case. Then on cross-examination the State asked the appellant if he and the deceased had not had trouble over a bill or account, and if he had not pressed the matter. This cross-examination was proper. [State v. Bagby, 338 Mo. 951, 93 S. W. (2d) 241, 247 (8).]

IV. The last seven assignments of error in the motion for new trial severally complain of instructions given. Only a few of these are specific enough to comply with the requirements of the new trial statute. [Sec. 3735, R. S. 1929, Mo. Stat. Ann., p. 3275.] To say of an instruction that it is "erroneous, ambiguous, conflicting and improper," or any one of these, without attempting to point out why, is wholly insufficient. The law does not allow the defendant to turn

the case into a guessing contest. It has been said the statute was enacted to prevent the trial court from being ambushed by "masked batteries." [State v. Standifer, 316 Mo. 49, 53, 289 S. W. 856, 857.] But it is even more unfair to bring such assignments before an appellate court without briefing them, than it is to present them to the lower court where the case was tried and counsel were present and subject to interrogation when the motion was ruled. Appellant's brief in this court specifically mentions only Instruction No. 1.

The specific complaint made of Instruction No. 1 is that it assume the appellant mortally wounded the deceased. We think the instruction is not open to that criticism, but since it was directed to the crime of second degree murder and the appellant was only convicted of the lesser crime of manslaughter he is in no position to complain even if there were errors in the instruction. [State v. Flinn (Mo. Div. 2), 96 S. W. (2d) 506, 511.]

Another assignment says of Instruction No. 2 that it "does not properly inform the jury of the law of manslaughter." This is not a good assignment, but we will add, nevertheless, that the instruction is even better drawn than a similar one held good in State v. Bradford, 324 Mo. 695, 705, 24 S. W. (2d) 993, 996. Likewise, it is charged that Instruction No. 3 did not "properly and legally define the law of self-defense." Again indulging counsel, we will say this instruction was good and that in whatever respects it may be subject to criticism, the shortcomings were favorable to appellant.

Specific complaint is made of Instruction No. 4 that it assumed the deceased died as a result of injuries inflicted by the appellant. The instruction in substance told the jury if the appellant struck a blow causing injury to Gross, and that the blow was of such force and nature as to have brought about or caused his death, then the fact that Gross may not thereafter have received proper medical treatment would not relieve appellant. The opening part of the instruction does assume the facts that a blow was struck, and that the blow caused injury. It says: "If you find from the evidence beyond a reasonable doubt, that the Defendant wilfully and knowingly struck *the blow that caused an injury to Daniel I. Gross.*" But it does not assume, as the assignment charges, that Gross died as a result of injuries inflicted by appellant. On the contrary it required the jury to find "that said blow was of such force and of such nature as to have brought about or caused the death of said Gross." And the concluding lines of the instruction informed them they must "be satisfied from all the evidence, beyond a reasonable doubt. that said Gross did die as a result of an injury which was inflicted by this defendant."

The final assignment in the motion for new trial is that "the court erred in refusing to properly instruct the jury on excusable

homicide, which was requested by defendant." The record does show that such request was made. In Instruction No. 2 the court gave the following definition: " 'Excusable homicide,' as used in these instructions, means the accidental killing of another." Section 3986, Revised Statutes 1929 (Mo. Stat. Ann., p. 2792), provides:

"Homicide shall be deemed excusable when committed by accident or misfortune, in either of the following cases: First, in lawfully correcting a child, apprentice or servant, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without unlawful intent; or second, in heat of passion, upon any sudden or sufficient provocation, or upon sudden combat, without any undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel and unusual manner."

It will be seen the section makes a homicide excusable when it is committed by accident or misfortune in instances specifically enumerated. The instruction as given leaves out all these limitations, and simply tells the jury that excusable homicide means an accidental killing. It was, therefore, more favorable to the defendant than he was entitled to, State v. Ryland, 324 Mo. 714, 720, 25 S. W. (2d) 109, 112.

 V. This covers all the assignments made by appellant except a few touching the instructions, which are not entitled to consideration for reasons already pointed out. But the learned Attorney General in his brief has raised a question which calls for discussion. The record shows that at the beginning of the trial on November 21 a jury was impaneled. Then the State called five witnesses, who gave their testimony. Thereafter on the same day according to the record, the defendant waived formal arraignment and entered a plea of not guilty; and the jury were "duly impaneled and sworn to try this cause and a verdict render according to law and the evidence." The trial was then resumed and further evidence adduced by the State, together with all the evidence for the defendant. It thus appears that although the jury had been "impaneled" at the very beginning of the trial they were not sworn to try the cause until after the testimony of five witnesses had been heard. Neither had the appellant been arraigned and entered his plea of not guilty until that time. But no objections were made or exceptions saved by the appellant.

The question raised by the learned Attorney General is whether the foregoing omissions invalidated the trial, verdict and judgment. He maintains they did not, and we think that view is correct. As regards the failure to arraign the appellant and take his plea of not guilty at or before the beginning of the jury trial, it need only be said the conviction would stand even though the record were wholly silent on that point. Section 3615, Revised Statutes 1929 (Mo. Stat.

Ann., p. 3187), provides: "That no judgment· rendered in any criminal case shall be reversed, set aside or for naught held for the reason that the record does not show that the defendant was arraigned and a plea of not guilty entered, where a trial was had in all respects as though the defendant had been arraigned and had formally tendered the general issue under a plea of not guilty."

Relative to the impaneling and swearing of the jury. Our statutes contemplate that the jury shall be impaneled and sworn at the threshhold of the trial. [Secs. 3678 and 3681, R. S. 1929, Mo. Stat. Ann., pp. 3226 and 3227.] But it is well settled that the provisions of the statute bearing on the impaneling of a jury may be waived. [35 C. J., sec. 406, p. 368; State v. Hart; 331 Mo. 650, 656, 56 S. W. (2d) 592, 594.] On the other hand it is imperative that the jury be sworn to try the cause and that the record show it. ·[16 R. C. L., sec. 107, p. 293; 35 C. J., sec. 492, p. 422; L. R. A. 1917-D, 400, note; State v. Mitchell, 199 Mo. 105, 97 S. W. 561, 8 Ann. Cas. 749; State v. Duff, 253 Mo. 415, 424, 161 S. W. 683, 685; State v. Vinson, 337 Mo. 1023, 1026, 87 S. W. (2d) 637, 639.] However, a party may waive irregularities in the swearing of the jury, where there has been substantial compliance with the statute. [35 C. J., sec. 407, p. 369.]

We have been unable to find many cases in point on the question presented by this record. In Lyons v. State, 80 Tex. Cr. Rep. 231, 189 S. W. 269, a jury was duly impaneled and sworn to try the defendant in one case and the district attorney dismissed it. Thereupon the court proceeded with the trial of another criminal case (for perjury) against the defendant without swearing the jury again, and without objection or exception on his part—until he filed his motion for new trial following his conviction. It was ruled there had been a substantial compliance with the statute. To the contrary, in People v. Pelton, 116 Cal. App. 789, 7 Pac. (2d) 205, a jury had been sworn to try the defendant on a larceny charge when the prosecuting attorney dismissed it. Thereupon the defendant stipulated that the same jury might try him upon a new complaint, which was filed, and the trial proceeded to a conviction without impaneling and swearing the jury anew. The defendant did not expressly waive such impaneling and swearing, but the omission was not brought to the court's attention and the defendant did not object at the trial on that account. The opinion holds that, "while mere irregularities in the swearing or in the form of oath may be waived by failing to object until after a verdict, an entire failure to swear the jury cannot be waived in any manner or under any circumstances."

In Boroum v. State, 105 Miss. 887, 891, 63 So. 297 and 457, the defendant was convicted of the unlawful sale of liquor. Seven of the jurors, who were added to the regular panel from talesmen, were not sworn as jurors until shortly after the case was closed. The case holds

that since the tales jurors were sworn before they had conferred and deliberated for the purpose of reaching a verdict, the right of the appellant to a jury, guaranteed to him by law, was not in any way denied, impaired, or diminished by the delay in swearing the jurors. On suggestion of error a further opinion was written stressing the fact that the record failed to show the appellant made objection before the return of the verdict to the belated swearing of the jury, in accordance with a State statute.

In Miller v. State, 122 Miss. 19, 35, 84 So. 161, the defendant was convicted of murder. The evidence for both the State and defendant had been introduced and both sides had rested before it was discovered the jury had not been sworn to try the cause. The oath was then administered over the appellant's objection, and the cause was argued and submitted a verdict of conviction following. The judgment was reversed and the cause remanded by the Mississippi Supreme Court, two of the six justices dissenting. The reasoning of the opinion is that the jury was not a legal jury until it had been sworn to try the cause; that all the evidence was heard by the jury before they had been sworn to try the cause, and that consequently the verdict was not based on any evidence heard while they were a legal jury under oath to hear and consider the proof and try the issue. The opinion also suggests that probably the sanctity of an oath would have its bearing and influence upon the jurors in their consideration of the proof before them.

But in Stark v. State, 133 Miss. 275, 97 So. 577, in the trial of a felony case, three talesmen on the jury were not sworn to try the cause until after the State had finished its evidence and rested its case. The oath was then administered to them over the defendant's objection. The judgment of conviction was affirmed, three of the justices holding, in line with the Boroum case, supra, that the error in failing to swear the jury before any evidence was heard, was harmless; that there is no difference in principle between failing to swear the jury in a capital case and a noncapital case; and that the Miller case, supra, should be overruled. One justice agreed it made no difference whether a case was a capital case or not, so far as concerned the question involved; but held that since the Boroum case was bottomed on the defendant's failure to make timely objection to the swearing of the jurors, and in the Miller case such objection had been made, both decisions ought to stand; and that the cause should be reversed and remanded, following the Miller case. The remaining two justices concurred in the affirmance of the judgment, without agreeing that the Miller case should be overruled. They held the Miller case was good law because of the gravity of a capital case and because the Mississippi statute required the jurors in such cases to take a special oath.

While, in the course of ordinary procedure, the jury should be sworn to try a cause before any evidence is received, yet it is our opinion that if the record shows they were sworn during the progress of the trial and before they had begun to deliberate upon their verdict, the error is not fatal; and is waived if the defendant fails to object and except at the time. On this point we agree with the holding in Boroum v. State, and the majority opinion in Miller v. State, the Mississippi cases, supra. It is held in State v. Hayes (Mo. Div. 2), 295 S. W. 791, 793, that complaints of this sort are matters of error, which must be assigned in the motion for new trial; and of course this means the error must be called to the attention of the trial court by a proper objection and exception at the time, if the fact be known to the defendant. We are not called upon to say whether the omission occurring in this case, of failing to swear the jury until after five witnesses had been heard, would be good ground for reversal and remanding if the point had been raised below and preserved. But we do hold that without any objection or exception made by the appellant in the trial court the error is not now open to review here.

Finding no reversible error the judgment and sentence below are affirmed. All concur.