**STATE of Missouri, Respondent,**

v.

**Wilton CHEATHAM, Appellant.**

No. 47921.

Supreme Court of Missouri,
Division No. 2.
Nov. 14, 1960.

Alphonse J. Lynch, St. Louis, for appellant.

John M. Dalton, Atty. Gen., Richard W. Dahms, Sp. Asst. Atty. Gen., for respondent.

BARRETT, Commissioner.

■ An indictment charged that on March 15, 1959, Wilton Cheatham willfully, premeditatedly and of his malice aforethought, with his fists and feet, "did feloniously, kick, stomp, strike, hit, beat, and bruise" Ruth Ann McFarland upon her head and body, inflicting a mortal wound of which she died five days later. Upon a trial under this indictment a jury found Cheatham guilty of murder in the second degree and fixed his punishment at ten years' imprisonment. The indictment appropriately charged the offense of murder in the second degree (V.A.M.S., Secs. 559.-010, 559.020), the jury's verdict was responsive and assessed the minimum punishment. V.A.M.S., Sec. 559.030; State v. Frazier, 339 Mo. 966, 98 S.W.2d 707; State v. Shriver, Mo., 275 S.W.2d 304.

Several of Cheatham's assignments of error have the effect of challenging the sufficiency of the evidence to support the principal instruction and the jury's finding of murder in the second degree. According to Cheatham and Ruth's sister this is the background in which Ruth came to her death: On March 14, 1959, Ruth Ann McFarland, age 26, and her five children, ranging in ages from ten to two, lived at 2349 Division Street, in apartment 300. The appellant, Cheatham, age 32, had lived with Ruth "for a period of three or four years" and was the father of three of her children. In March 1959 Cheatham was not living with Ruth but three or four days before her death she had given him a key to her apartment. On the night of March 15, 1959, the oldest child, Sheila Jean, age 10, was baby-sitting her three brothers and sister. By previous arrangement Cheatham, a postal employee, and Ruth were to meet at the Crossroads Tavern. Ruth and her sister, Thomasenia Smith, went to a basketball game and about 10 o'clock went to the Crossroads Tavern to keep Ruth's appointment with Cheatham. Cheatham was not there and about 10:30 or 11 o'clock the sisters, with Thomasenia's friend, Mr. Craggy, went to the Carioca, another tavern, and there Ruth drank "one shot of Cognac" and one bottle of ale. Thomasenia didn't like the Carioca and "she were dancing" and so they left that bar and went to the Eleven-eleven Bar where Ruth danced but had no drinks, so Thomasenia says. About midnight Thomasenia and her friend took Ruth home, saw her enter

the apartment and the upstairs lights come on. Ruth was not then drunk, says Thomasenia, and there were no bruises on her face and head. Cheatham says that when he went to the Crossroads Tavern between 10:30 and 11 o'clock Ruth was not there, he waited a half hour or more and when she did not show up went to her apartment, let himself in with her key, looked in the bedroom, saw that she was not there, took his shoes off, had a seat in the front room "and waited on her."

Cheatham fell asleep and about 1:30 Ruth awakened him by knocking on the door. He says that she walked in and he took her coat and pocketbook and put them on a table. He asked her where she had been and she said that she had been out with Thomasenia and her boy friend and "they had made her drunk." She said that she had some beer, some Cognac, some Scotch, "about a dozen drinks." He said that Ruth's lips and eyes were swollen and she was very drunk and wanted him to go to the police with her and asked him to " 'try to sober me up.' " So he took Ruth to the bathroom, she was "trying to heave" and he "slapped her on the back a couple times" and she fell to the floor from the stool. He dragged her into the living room, took her clothes off and put her to bed on top of a sheet and covered with another sheet. She was then groaning and complaining that her stomach hurt but he "couldn't stand" the odor of alcohol and he told Sheila, who was standing in the doorway, to go to bed and he went in the front room and sat down. Later he heard a commotion and when he went to her bedroom found her lying on the floor and "she said she tried to get up and fell into the chest." He says that he saw blood coming out her ear, told Sheila to call her aunt and he called the police. He denies that he hit or beat her with his fists, or that he kicked or stomped her although "I might have stepped on partial of her body. I never kicked the girl." He says that he was not angry or jealous, "I loved the girl."

But Sheila says that when she awoke and looked in the bathroom Cheatham "was trying to bump her head on the tub." He then hit Ruth twice in the back with his fist and she fell to the floor, "Then he put his foot in the back and stomped on her head" with his bare feet. Sheila says that her mother did not say anything, "She was moving her head back and forth when he was trying to bump her head on the tub." Sheila says that he then took her mother "by the collar" and dragged her "on her stomach" to the front room, "Then he poured this water over her head," tore her clothes off, put her in bed, took her money from her wallet and "told me to go to bed." When Sheila woke up again her mother was on the floor in her bedroom, "blood running down the corner of her eye," so she "woke up Cheatham" and he put Ruth back in bed and told Sheila to call her aunt. Ruth was taken to City Hospital No. 2, she was then unconscious and never regained consciousness and if five days later she died as the result of injuries inflicted by Cheatham the jury could justly and fairly find that he was guilty of murder in the second degree. State v. Shriver, supra; State v. Frazier, supra; State v. Jackson, Mo., 48 S.W.2d 936.

Cheatham does not claim justifiable homicide, there was no evidence of provocation, and he does not claim that he accidentally killed her. If he was guilty at all he was guilty of murder and there was no circumstance or evidence demanding an instruction on manslaughter. State v. Jackson, supra; State v. Foran, 255 Mo. 213, 164 S.W. 215; annotation 102 A.L.R. 1019, 1021. There is no evidence to the effect, "that the *deceased pushed the defendant* and at such time the *defendant grabbed her* while she was in a drunken and intoxicated condition and she * * * thereafter fell on and near objects which could have caused her death;" as asserted in one of his assignments of error. As to the facts resulting in Ruth's injuries, Cheatham's beating and kicking her, the state does not rely

on circumstantial evidence and in many important respects his testimony corroborates Sheila's eyewitness account. In these circumstances the court was not required to give an instruction on circumstantial evidence. 26 Am.Jur., Secs. 524–525, pp. 520–521; State v. Jackson, Mo., 186 S.W. 990, 993; State v. Loston, Mo., 234 S.W.2d 535, 538.

In connection with the sufficiency of the evidence and the instructions, however, the state's claim that several of the appellant's assignments in his motion for new trial are too indefinite to present reviewable questions within the meaning of the new trial statute and rule, V.A.M.S., Sec. 547.030; Rule 27.20, V.A.M.R., are entirely beside the point. For example, there is an assignment that the court erred in submitting the cause to the jury because "there was no testimony or evidence sufficient for submission as to the cause of death for reason that no medical witness testified or was able to give any probative and cogent evidence as to the cause of death." In substance it is said that there was no testimony that the defendant ever touched her side or stomach, hence if such injury occurred it could only be inferred from the circumstances and left the cause of injury and death in conjecture and demanded a circumstantial evidence instruction. As stated, Ruth died five days after her admission to the hospital and her post-mortem examination and the report were made by Dr. Connor who was dead at the time of the trial, therefore it is said that the report was inadmissible as hearsay, that Dr. Hamilton, the state's main medical witness, disputed the cause of death as stated in the report and that his testimony as to the cause of Ruth's death and his recital of the contents of the post-mortem report were all hearsay. As indicated, the state's claim and failure to brief any of these matters overlooks the very important fact that "A person is not criminally responsible for a homicide unless his act can be said to be the cause of death." 26 Am. Jur., Sec. 45, p. 189. The burden is upon

the state to prove all the elements of the offense of second degree murder which includes proof "that the defendant's act caused death." 26 Am.Jur., Sec. 285, p. 351.

The record in this case meets all of these requirements and the appellant's objection. In his capacity as pathologist and in making his post-mortem examination and report Dr. Connor was a public official. Supp.V.A.M.S., Sec. 58.451. Here the record of his examination was accounted for and identified as a record kept in the coroner's office and it is no longer a valid objection to this and similar reports that they are "hearsay." V.A.M.S., Sec. 490.-680; State v. Churchill, Mo., 299 S.W.2d 475, 478–479; State v. Baker, Mo., 276 S. W.2d 131, 134–135. Furthermore, the objections in the motion for a new trial overlook two important facts, Dr. Hamilton attempted to treat Ruth while she was in the hospital, he signed her death certificate and he was present when Dr. Connor performed the autopsy. It was necessary that Dr. Hamilton and another pathologist interpret some of the terms contained in Dr. Connor's report but aside from their interpretation of terms the report shows that Ruth had "marked contusions of the abdominal wall," "diffuse localized subdural hemorrhage in the left occipital region," the left pleural cavity "contains some thick greenish yellow exudate" 700 cc. total volume, "localized peritonitis at the portion of the abdomen," "gangrenous areas as a result of a contusion in the lesser curvature" and the "esophagus was hemorrhagic." Dr. Connor's report listed four causes of death in this ordered number, "pneumo-peritoneum," "peritonitis," "ruptured stomach" and "empyema, right side." It is not necessary to detail Dr. Hamilton's examination of Ruth, he found that her injuries were traumatic and while it was his opinion that one of the causes of her death was an injury to the brain he said, "The cause of death in this particular patient may be attributed to all the various findings at the post mortem examination," the empyema

"was probably the severest." Finally, in answer to a detailed hypothetical question that assumed the facts as testified to by Sheila the doctor gave it as his opinion that there "was a causal connection between the incident as related which occurred in the apartment of this woman on March 15, 1959, and her death on March 20, 1959." 26 Am.Jur., Sec. 436, p. 457. In these circumstances there was "probative and cogent evidence as to the cause of death" and the court did not err in admitting the indicated testimony, in instructing the jury or in submitting the cause to the jury. State v. Brinkley, 354 Mo. 1051, 193 S.W.2d 49. "Liability for homicide does not depend upon the fact that death is the immediate consequence of the injury inflicted by the accused. One who inflicts an injury on another is deemed by the law to be guilty of homicide if the injury contributes *mediately* or *immediately* to the death of such other. The fact that other causes contribute to the death does not relieve the actor of responsibility, provided such other causes are not the proximate cause of the death." 26 Am.Jur., Sec. 48, p. 191.

 In connection with the instructions it is urged that the court erred in giving that part of instruction three which deals with "reasonable doubt." That part of the instruction contains the clause "but a doubt to authorize an acquittal on that ground ought to be a *substantial doubt* touching the defendant's guilt and not a mere possibility of defendant's innocence." (Italics supplied.) It is said that the instruction is contradictory and confusing and "that a requirement of substantial doubt devaluates the requirement of the lack of a reasonable doubt for conviction and leaves and makes possible a conviction where there is little or no doubt, all in violation of the law." Unlike many other cases in which there was a single or separate instruction on reasonable doubt, instruction three is a longer instruction and covers the subject that the indictment was but the formal charge and was not to be taken as evidence of guilt, it covered the presumption of the defend-

ant's innocence and instructed upon the credibility of the witnesses and the fourth paragraph dealt with reasonable doubt. It has often been recommended that reasonable doubt instructions follow the exact language of the statutes (53 Am.Jur., Sec. 750, p. 560) but the mere description "substantial" doubt has been frequently employed if not coupled with other language such as a "well-founded doubt." 53 Am. Jur., Sec. 752, p. 562; 23 C.J.S. Criminal Law § 1275, p. 845; State v. Young, 105 Mo. 634, 16 S.W. 408. But as to the specific objections urged here it has been held that the language does not render the instruction contradictory or argumentative and does not "whittle away" or minimize the defendant's rights and the presumption of innocence. In the circumstances of this case, in its context and as to the specific objection the instruction was not manifestly erroneous. State v. Turner, Mo., 320 S.W. 2d 579, 584–585; State v. Frazer, 363 Mo. 77, 248 S.W.2d 645; State v. Berry, 361 Mo. 904, 237 S.W.2d 91

 Three final assignments in the motion for a new trial are directed to the prosecuting attorney's argument and to one question propounded to the appellant on cross-examination. But as to one of the arguments and the question the record reveals that the trial court sustained defense counsel's objection, there was no request that the jury be instructed to disregard the question or the argument and these two matters are not now available to the appellant as error. 23 C.J.S. Criminal Law § 1066, p. 493. The other assignment is that the court improperly permitted state's counsel to argue "the matter of crime in the community" when there was no evidence as to community crimes, all to the prejudice of the appellant. The matter particularly set forth in the assignment, crime in the community, was a legitimate appeal by the prosecuting attorney, he "may illustrate the effect of their verdict on the community or society generally with respect to obedience to, and enforcement of, the law." 23 C.J.S. Criminal Law § 1107,

p. 584; State v. Carter, 345 Mo. 74, 131 S.W.2d 546.

There was allocution (Sup.Ct.Rules 27.-08, 27.09) and as indicated at the outset questions not required to be presented in a motion for new trial have been examined and the transcript shows compliance with all matters necessary to be considered by this court "upon the record before it." Sup.Ct. Rule 28.02; V.A.M.S., Sec. 547.-270.

The judgment is affirmed.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.