**STATE of Missouri, Respondent,**

v.

**Bruce Ray WILBORN, Appellant.**

**No. 35759.**

Missouri Court of Appeals,
St. Louis District,
Division Four.

May 6, 1975.

Motions for Rehearing on Transfer
Denied June 26, 1975.

---

William Shaw, Public Defender, Joseph R. Aubuchon, Asst. Public Defender, Clayton, for appellant.

John C. Danforth, Atty. Gen., K. Preston Dean, II, Scott A. Raisher, Asst. Attys. Gen., Jefferson City, for respondent.

ALDEN A. STOCKARD, Special Judge.

Bruce Ray Wilborn, charged under the Second Offender's Act, § 556.280, RSMo 1969, V.A.M.S., with robbery in the first degree, was found guilty by a jury and sentenced by the court to imprisonment for a term of thirty years.

On September 26, 1972, Frederick Leon Caby, proprietor of a Clark Service Station located at 7731 Page Avenue, St. Louis County, was servicing the automobile of Adrian DeHart. A Chevrolet Nova station wagon entered the service station. It had two or three occupants and the driver was appellant. At appellant's request Mr. Caby checked the oil and added a quart. Mr. Caby then returned to the DeHart automobile, but appellant followed him and stated that he wanted a dollar's worth of gasoline. Mr. Caby told appellant he would have to wait until he had finished servicing the DeHart automobile, and he then went to the back room of the building to get an oil rag. He testified that he "found a colored male * * * ransacking my cabinets and money drawers and places where I keep the day's receipts." According to Mr. Caby, "his pockets and waistline was bulged with money he got out of the drawer, one of the drawers there." When Mr. Caby entered the room the person "pulled" from his pocket a .38 calibre revolver, the property of Mr. Caby which he had taken, pointed it at Mr. Caby and pulled the trigger, but the revolver did not fire because there was no bullet in the chamber. Mr. Caby grabbed the gun and "pushed it over in one of the shelves there." He also grabbed the person's hair and "started pushing his face in the wall." At this time appellant entered the room, picked up a pair of garden shears, and "stuck" them in Mr. Caby's neck and told him to turn the person loose or he would run the shears through his throat. Because of this Mr. Caby turned the man loose, and he and appellant left and drove away in the Chevrolet Nova.

On cross-examination, Mr. Caby testified that when he first went in the back room "they [he?] already had [the] gun and already had the money," and that the reason he scuffled with the person was to "keep this man from shooting me."

Section 560.120, RSMo 1969, provides: "Every person who shall be convicted of feloniously taking the property of another from his person, or in his presence, and against his will, by violence to his person, or by putting him in fear of some immediate injury to his person; * * * shall be adjudged guilty of robbery in the first degree."

The court instructed the jury that if it found and believed from the evidence beyond a reasonable doubt that the defendant, Bruce Ray Wilborn "did wilfully, unlawfully and feloniously make an assault upon one Fred Caby by putting the said Fred Caby in fear of an immediate injury to his person by means of a certain dangerous and deadly weapon, a pair of shears, * * * and if you further find and believe * * * that by so putting the said

Caby in fear of such personal injury * * with the said shears * * * the defendant did then and there wilfully, unlawfully, and feloniously take and steal U.S. currency, the property of Clark Service Station, then and there in the lawful custody of Fred Caby * * * in the presence of and against the will of the said Fred Caby with the felonious intent then and there to steal the said currency, * * * then you will find the defendant guilty of Robbery in the First Degree by means of a Dangerous and Deadly Weapon."

▮▮▮ Appellant contends that the trial court erred in giving this instruction "because there was no evidence that the defendant or anyone else obtained possession of the money by means of a dangerous and deadly weapon." Appellant argues that possession of the money (and pistol) was obtained by stealth, and that the pistol and the money were already in the hand and pockets of the colored man when Mr. Caby came into the back room of the service station.

Appellant cites numerous cases, all to the effect as stated in *State v. Vandament,* 299 S.W.2d 532 (Mo.1957), that " 'In order to constitute robbery by intimidation, it is essential that the property taken be surrendered because of the apprehension of injury, and that the fear be that under compulsion of which the victim parts with his property. The fear essential to robbery must be caused by accused, intentionally, and not arise from the mere temperamental timidity of the victim.' " See, for example, *State v. Adams,* 406 S.W.2d 608 (Mo.1966); *State v. Hawkins,* 418 S.W.2d 921 (Mo. banc 1967); *State v. Thompson,* 414 S.W.2d 261 (Mo.1967); and for an older case, see *State v. Parker,* 262 Mo. 169, 170 S.W. 1121 (1914).

At the time the trial judge determined that the evidence would sustain an instruction on robbery, the court approved the following statement of the law, as set out in 77 C.J.S. Robbery § 11: "In order to constitute robbery, the force or fear may and must be employed either to obtain or retain possession of the property or to prevent or overcome resistance to the taking; but as discussed infra § 13, force employed merely as a means of escape is not sufficient. * * * Although there is a measurable period of time between the taking and subsequent force, if the latter occurs so soon after the former as to be a part of the same transaction the violence is legally concomitant with the taking."

In II Wharton's Criminal Law and Procedure, § 559, in discussing the "Time of exercise of force and fear," it is stated: "The act of the defendant may either precede or be concurrent with the taking of the victim's property. But in any case the circumstances must be such that at the time of the taking of the property the victim was in fear. * * * The fact that there is a substantial interval between the time when the defendant acts and the time when the victim gives up the property does not necessarily preclude a conviction for robbery if it is found as a fact that the victim was reasonably acting under the influence of fear induced by the defendant."

The precise factual situation of this case is unique, and general principles are helpful only as a guide, but in this jurisdiction, as well as others, it is well recognized that "the violence used in the robbery must precede, *or be contemporaneous with,* the taking of the property." (Italics added.) *State v. Parker,* 262 Mo. 169, 170 S.W. 1121, 1123 (1914). As noted by Wharton, supra, at § 559: "Conflict in the decisions in some states arises because of the uncertainty as to when the taking is completed."

In this case, the evidence is to be considered most favorably to the State and in conformance with the verdict, and when so considered at the time Mr. Caby discovered the man in the back room of his service station, the latter was then engaged in "ransacking [the] cabinets and money drawers and places where [Mr. Caby kept] the day's receipts." The person had picked up some or perhaps all of the money he ever

obtained, but he was still ransacking the cabinets, and he had not started to leave or to depart. He then continued the project already started by use of the deadly and dangerous weapon, the gun, and the transaction constituting a robbery was completed only when appellant entered and threatened Mr. Caby with serious bodily injury by use of the shears. In other words, under the factual situation of this case, the force or threat of serious bodily injury made by appellant was contemporaneous with the taking and a part of the single transaction.

In *State v. Parker, supra,* the accused stuck his hand in the victim's pocket and *removed* some money before the victim knew what had happened. In ruling that the offense of robbery was not committed, the court said: "The act of theft was *wholly accomplished* before [the victim] got frightened. No blow was struck or threatened; no weapon was used or shown; nor was any threat of injury, either immediate or remote, uttered by defendant." (Italics added). It was then held that the violence used was not contemporaneous with the taking of the property. As distinguished from the facts of the Parker case, the factual situation of this case is comparable in some respects to the "snatching with force" cases. In *State v. Spivey,* 204 S.W. 259 (Mo.1918), it was said: "Snatching a valuable article from another is always denominated robbery where any force is exercised either to overcome resistance of the person robbed or in detaching the article taken where it is fastened in some way to the clothing or person of the one robbed." See also *State v. Houston,* 451 S.W.2d 37 (Mo. 1974), and the annotation at 42 A.L.R.3d 1381. In the "snatching with force" cases the accused takes hold of the object but does not have full control because it is fastened to the victim, and force is necessary to complete the taking. In this case, the man in the back room had taken hold of some money but he did not have complete control because Mr. Caby entered the room while he was still ransacking, and force by

the man and putting in fear by appellant was necessary to obtain control and possession of the money.

In *State v. Clemons,* 356 Mo. 514, 202 S.W.2d 75 (1947), cited and relied on by appellant, it was stated: "There are decisions holding that when the accused had already obtained dominion over property by stealth and then used force and violence or putting in fear merely as a means of escape, the crime would not be robbery." But in applying the rule to the facts of that case the court said: "In this case it 'is true the appellant first snatched the pistol from the glove compartment of the automobile. But he then used it as a means of completing his dominion over the weapon itself, and of obtaining possession of the automobile, all as a part of the same res gestae. And it is generally held that when the sudden taking or snatching is *concurrent with intimidation or violence the crime is robbery.*" (Italics added.)

We have found two cases that are reasonably comparable on the facts. In *Montgomery v. Commonwealth,* 346 S.W.2d 479 (Ky. 1961), three persons entered a restaurant, but acted "so as to arouse [the] suspicion" of the lady in charge, a Mrs. Trimble. Appellant spread a newspaper on the counter and read or pretended to read it. A person by the name of Busby used the telephone, and then ordered a coca-cola and started toward the door. When Mrs. Trimble told him that he had not paid for the coca-cola he returned and gave her a dime. As she started to "ring it up" on the cash register, appellant was standing nearby. She heard a noise behind her and turned and saw Busby "leaning over the counter and lifting a box from the floor" which contained $58. Appellant then went through the swinging door in the counter to where she was, and she took a step or two toward Busby. Appellant then stepped up with an opened knife in his hand, called Mrs. Trimble a "bad name" and told her if she moved he would cut her throat. She testified on cross-examination that appellant "had made

no threatening 'gesture or maneuvers' toward her at any time before Busby got the box of money." The Kentucky statutes did not define the crime of robbery so the court looked to the common law for the definition and the distinction between larceny. It has been held as early as 1875 that the Missouri statutory definition of robbery "made no new distinction nor declared any new principle" to the common law definition. *State v. Broderick,* 59 Mo. 318 (Mo.1875). Therefore, the Missouri and Kentucky definitions of robbery are comparable.

In a well reasoned analysis of the crime of robbery, the Kentucky court held: "The appellant contends that the removal of the box of money from its place behind the counter was asportation, and thereby the crime of grand larceny was complete before the knife was displayed. Technically, that may be sufficient in some circumstances to consummate the crime of larceny. * * * Even that claim is tenuous, for there was scarcely a distinct measurable period of time between the removal of the property from the floor and the violence. * * * It is generally recognized that the requisite element of force or putting in fear must either precede or be contemporaneous or concurrent with the taking of the property. * * * Particularly, in *Armstrong v. Commonwealth,* * * * [190 Ky. 217] 227 S.W. 162, 163, we stated that it is not indispensable 'that the force employed or the putting of the person robbed in fear should precede the taking of the property. It will be sufficient if both or either accompany the taking of the property, and that was the case here.' * * *. In the present case it would be an unsubstantial conception of the facts to say that the taking of the box of money was completed, or that the larceny had already been consummated, when the defendant made his threat and displayed his knife. The acts originated and occurred in the same period of time, that is to say, were contemporaneous."

The other case of interest because of the factual similarity, is *State v. Culver,* 109 N.J.Super. 108, 262 A.2d 422 (1970). There Paul Caruso heard his daughter scream from the living quarters back of his grocery store, and when he opened the door to the living quarters he was confronted by the accused with a gun in his hand. A struggle occurred, and Caruso was struck over the head with the gun and accused made his escape. When the daughter had previously entered the living quarters she was struck from behind by the accused. There was no direct proof that the money had been taken before or after the assaults on the daughter and Caruso, but when Caruso was first confronted by the accused he noticed that his jacket was bulging. The court stated that "in the context of the facts before us, the taking was not terminated when the defendant took the money from the dresser drawer and [presumably] placed it in his coat pocket. Here, Caruso's precautions for the security of his property placed defendant in a position where, if he was to enjoy the stolen items, he had to take them out of the area of Caruso's control. * * * Unfortunately for defendant, first [the daughter] and then Caruso interfered with his exit." The New Jersey court continued: "Reason and logic would seem to dictate that where an owner of premises takes similar, though less effective, precautions against thievery and his opposition is overcome as he interposes himself to prevent the thief from taking the money from the portion of the premises in which it had been kept, his use of force is concurrent or concomitant with the taking, thus constituting the thief's action as robbery. * * * The series of events which allegedly took place here—the ransacking of the room, taking the money, [the daughter's] discovery of the thief and her giving of the alarm, Caruso's attempt to stop him, defendant's assault upon both of them and his consequently successful exit from the apartment—constituted a single incident or occurrence, the *res gestae* of the crime. * * * Such a

situation is clearly distinguishable from one in which force is used to foil pursuit after the taking is complete."

In this case the person was "ransacking" when Mr. Caby entered the back room and engaged the man in a scuffle. Appellant then entered and made his threat of serious bodily harm to Mr. Caby. It was all one single transaction. The trial court did not err in submitting an instruction to the jury on robbery in the first degree with a dangerous and deadly weapon.

█ Appellant's second point is that the trial court erred in overruling his objection to the testimony of Police Officer Newberry "that he arrested appellant based on the description and license plate number he received over the radio, in that the testimony allowed hearsay evidence ＊ ＊ ＊."

Mr. Marvin E. Chunn was the operator of a Standard service station next door to the Clark station operated by Mr. Caby. An automobile "came speeding in [his station] with the tires squealing" and a lady jumped out and said "Call the police, there's a hold-up going on next door." Mr. Chunn told his employee to call the police, and he went to the Clark station and took a pistol with him. He saw a "guy," whom he identified in court as the appellant, about halfway between the station and a Chevrolet Nova, and he told him to stop. An automobile then pulled in between them, and appellant ran to the Chevrolet Nova. Mr. Chunn fired at the Nova but it drove away. He then ran to his station and wrote down the first three figures or numbers of the license plate on the Nova, which were PE7. Mr. DeHart testified that as the result of the occurrences at the station he told his wife to take down the license number of the Chevrolet Nova, and she did, and that he later talked to the police and furnished them the information he had. Mr. Medlin of the Missouri Department of Revenue testified that the records of his office showed that the title to a 1963 Chevrolet Nova station wagon had been issued to Bruce A. Wilborn, and that the license number for the year following August 16, 1972 was PE7 346.

From the argument in appellant's brief we find that he apparently objects to the following testimony of Police Officer Newberry:

Q. Let me direct your attention back to the morning of September 26. Did you have occasion to proceed to Prairie and Lee Avenues?

A. Yes, Sir.

Q. What were you looking for when you proceeded there?

A. We had received radio—

Mr. Aubuchon [defense counsel]. I object, Your Honor. Hearsay.

Mr. Dittmeyer [prosecutor]. Can't testify to what you were told.

Q. Were you searching for anything when you went there?

A. I was.

Mr. Aubuchon: I object, Your Honor. Conduct based on hearsay.

The Court: Overruled.

A. I was searching for a '63 Nova station wagon that was—

Q. Were you looking for a particular license number?

A. Yes, Sir.

Q. When you got in the vicinity of Prairie and Lee, did you have occasion to see the automobile you were looking for?

A. Yes, Sir.

＊　　＊　　＊　　＊　　＊　　＊

A. At this time I turned my vehicle around and followed the vehicle at which time I could, I observed the license plate number on it.

Q. And was that the license plate you were looking for.

A. Yes, sir.

\* \* \* \* \* \*

Q. What was that?

A. PE7 346. Missouri License Plate.

Appellant argues: "The above testimony permitted the jury to connect appellant's complete license plate number (based upon the testimony by Mr. Medlin of the Bureau of Motor Vehicles) with the number purportedly recorded and reported to the police by Mrs. DeHart but of which there was no direct testimony by the State's case."

There were no objections except the two above set forth, and they were not specifically directed to the testimony about which appellant now complains. The contention now presented is totally without merit. The officer testified only to what he saw and what he did. That was not hearsay. It is true that the officer testified that he observed the automobile with the license plate PE7 346, and that the State showed that that was the license number on the automobile for which appellant had obtained a title. It is also true that the State showed that Mr. Chunn furnished the police the first three figures or numbers of the license on the automobile in which the robbers drove away, and that Mr. DeHart testified that he had given the police the entire number, although he did not testify as to what the number was. The precise basis for appellant's contention is difficult to understand, and for that reason we have set out the testimony and circumstances in greater detail than otherwise should be necessary, but in so doing we clearly demonstrate that the point is totally without merit.

■■ Appellant's third point is that the trial court "committed plain error by neither *sua sponte* declaring a mistrial nor instructing the jury panel to disregard the prosecuting attorney's highly prejudicial comment that the defendant, 'If he pleaded not guilty,' should 'speak for himself.'" The incident complained of occurred during the voir dire examination of Mary S. Cook.

MR. AUBUCHON: [defense counsel] Would it bother, would you hold it against Bruce Wilborn if he allowed the evidence to speak for itself and pled not guilty instead of going to that chair and saying so?

MR. AUBUCHON: [This answer undoubtedly was by Juror No. 7—Mary S. Cook] Nope.

MR. DITTMEIER: [prosecutor] Your Honor, I am going to object to that. I don't[?] think the question is ambiguous. Let him speak for himself if he pleaded not guilty instead of letting him sit in the chair. I don't understand the question.

THE COURT: I am, if you will forgive me for being confused even though the jury didn't appear to be. Will you rephrase the question?

There then followed some discussion not here relevant, and appellant's counsel then asked: "Would it affect your ability to presume innocence until, you know, until the contrary should be proven if it is proven because Bruce Wilborn did not take the witness stand?" The juror answered "No."

There are several reasons why this contention is totally without merit. First, there was no objection made at the time to the comment of the prosecutor. Second, there is no mention made whatever of this incident in the motion for new trial. However, appellant contends that the Court *sua sponte* should have declared a mistrial or instructed the jury to disregard the remark, and thereby attempts to invoke the "plain error" rule.

We note that it was *appellant's* counsel who *first* made mention of what effect appellant's failure to testify could have. Section 546.270, RSMo 1969, provides that "If the accused shall not avail himself \* \* \* of his \* \* \* right to testify \* \* \* it shall not be construed to affect the innocence or guilt of the accused, nor shall the same raise any presumption of guilt *nor be referred to by any attorney in the case*

* * *." (Italics added.) See also Rule 26.08. After appellant's counsel asked the question he did, it is obvious that the prosecutor then attempted to rephrase the question that had been asked to demonstrate why he did not understand it. We reject appellant's assertion that in effect the prosecutor retaliated by stating in unequivocal terms, "Let him speak for himself if he pleaded not guilty instead of letting him sit in the chair." What appellant here attempts to do is to take the prosecutor's comment completely out of context, and ignore the fact that he was the one who first presented the issue, and was the first to inject what effect the jury should give to his failure to testify, if he did not do so. If there was anything wrong with the comment of the prosecutor, and under the circumstances, we think not, it was self-invited, and under those circumstances did not call for any action by the trial court *sua sponte*, and did not constitute plain error within the meaning of Rule 27.20(c).

Appellant also argues that his federal constitutional rights were prejudiced, and he cites *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), and *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Both of these cases involved situations where there were direct and certain references to the failure of the accused to testify. When considered in context, it is reasonably apparent that the prosecutor merely attempted to rephrase what appellant's counsel had said to demonstrate why the question to the prospective juror was confusing and had not been understood. It did not constitute argument to the jury. The "facts and circumstances of each case must be carefully analyzed to determine 'Whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " *United States v. Mahanna,* 461 F.2d 1110 (8th Cir. 1972). In *State v. Hutchinson,* 458 S.W.2d 553, 556 (Mo. banc 1970),

this court set forth the proper scope of review in a case where the objection was to a jury argument as follows: " 'Whether or not a particular improper argument is so prejudicial under the facts in a particular case, as to necessitate a reprimand of counsel or a discharge of the jury, is largely within the discretion of the trial court. An appellate court will not interfere unless the record shows that the trial court abused its discretion to the prejudice of the appellant.'"

Here, the comment was not made in argument but in response to a question by appellant's counsel to a juror on voir dire examination; it was made because of the confusing nature of the question by appellant's counsel; and when the comment is read in context it did not imply that appellant should testify, but was no more than a rephrasing of the question of appellant's counsel with the comment that the prosecutor could not understand the question. This was not an incident calling for *sua sponte* action on the part of the trial court in the protection of appellant's federally protected rights by declaring a mistrial or by giving an instruction during the voir dire to the jury to the effect that no inference should be drawn by the failure of the accused to testify. Admittedly, there may be occasions when the trial court has a duty to take some action without a request, but they may be called extreme situations. Here the court witnessed the incident, heard the inflection of the voice of the prosecutor when he attempted to justify his reason for not understanding the question, and the court was able to determine whether the incident called for any action on its part without a request. On appeal, with only the benefit of the record before us, we cannot say that the failure of the court to take some action *sua sponte* resulted in error requiring or justifying a reversal of the judgment.

▮▮▮ Appellant's final point is that the trial court erred in not declaring a mistrial

"after inflammatory and prejudicial remarks by the prosecutor during his closing argument." From the argument we can determine that reference is had to the comment by the prosecutor in closing argument that: "So, ladies and gentlemen, I am going to ask you to retire and ask you to come back with a verdict of guilty and it is extremely important that you return a verdict of guilty. The evidence has been proven, he's guilty, you know your crime on the streets, well, this you know. Most people —." At this point appellant objected, stating that "this man is not being tried for crime on the streets." The trial court sustained the objection, and pursuant to appellant's request, ordered the remark stricken, but denied appellant's request for a mistrial.

It has frequently been held that it is permissible for a prosecutor to "illustrate the effect of their [the jury's] verdict on the community or society generally with respect to obedience to, and enforcement of, the law." *State v. Cheatham,* 340 S.W.2d 16, 20 (Mo.1960). For other cases, see *State v. Gordon,* 499 S.W.2d 512 (Mo.1973), where it was held proper for the prosecutor to refer to the fact that the crime occurred in a "high crime area"; and *State v. Pruitt,* 479 S.W.2d 785 (Mo.1972), where reference in argument to the high "crime rate" was held to be permissible. The prosecutor has the right to call attention to the prevalence of crime in the community to urge the jury to do its duty and to uphold the law. *State v. Elbert,* 438 S.W.2d 164, 166 (Mo.1969). However, in this case a cautious trial judge sustained the objection and ordered the remark stricken. The only relief requested and not granted was a mistrial. Assuming the reference to "crime in the streets" was improper, and under the circumstances we think it was not, the declaration of a mistrial is a drastic remedy which should be exercised only where the prejudicial effect can be removed no other way. *State v. Smith,* 431 S.W.2d 74 (Mo.1968); *State v. Camper,* 391 S.W.2d 926 (Mo.1965). This determination rests largely with the trial judge who observed the incident and can best judge the prejudicial effect upon the jury, and the possibility of its removal by the action taken. *State v. Raspberry,* 452 S.W.2d 169, 173 (Mo.1970). Under the circumstances here, we find no prejudicial error.

The judgment is affirmed.

SMITH, C. J., and NORWIN D. HOUSER, Special Judge, concur.