**STATE of Missouri, Respondent,**

v.

**Charles McKINNEY and Leroy Mayes, Appellants.**

Nos. 55746, 55747.

Supreme Court of Missouri, Division No. 2.

Dec. 13, 1971.

Motion for Rehearing or to Transfer to Court En Banc Denied Jan. 10, 1972 in No. 55746.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Sp. Asst. Atty. Gen., St. Louis, for respondent.

Robert H. Dierker, St. Louis, for Charles McKinney, appellant.

Harry L. Bell, St. Louis, for appellant Leroy Mayes.

PRITCHARD, Commissioner.

In a consolidated trial, appellants were found guilty of murder in the first degree. The jury was unable to assess the punishment and the court set it at life imprisonment for each appellant. On this appeal each appellant has filed a brief.

About 6:00 p. m. on December 4, 1968, Claude Johnson, Tom Croce, Mike Lograsso and a customer were in Mike's Restaurant at 2030 North Market Street in St. Louis, Missouri. An employee, Elizabeth Catron, was also there, but was back in the kitchen. Four men came in and ordered Claude, Tom, Mike and the customer to lie on the floor. Then they took money out of the cash register, and from Mike and Tom, and after that they shot Mike and Tom. Claude recognized one of the men he later found to be Walter Berry, and also recognized a man he knew as Willie Brannon. A third man came in with a double-barreled shotgun in his hand. Claude knew the man at the time, but not his name. He later determined that he was Charles McKinney. The fourth man was also known to Claude except for his name. His name was also later determined by Claude to be Larry Fair. Claude made an in-court identification of Charles McKinney as being the man who was present with the shotgun. It was Berry who took the money from the cash register, and from Mike Lograsso whose death resulted from a gunshot wound inflicted by Berry. Claude identified the shotgun, State's Exhibit 6, which was held by McKinney. McKinney had a mask over his face, but Claude could see a scar through it.

On direct examination by the state, Mary Jones testified that she lived at 2334 North Market, a block from the Lograsso Restaurant, on December 4, 1968. About 6:00 o'clock that evening she was home with her children. "Q. Who else was there besides you? A. Me and my kids and Walter Berry, Leroy Wright and Larry Fair, Charles McKinney and Judo, I don't know his name." At that time Mary saw a small gun and a shotgun which were held by Larry Fair. Walter Berry had the pistol, and said he was going to hold up the restaurant. They all left about 6:30 that evening, and about 7:00 to 7:30 Walter Berry came back to Mary's house with Larry Fair, and she thought that Charles McKinney also came back. Berry said that he shot him, and in response to that remark the others said that he did not have to shoot him. Mary testified further on direct examination that Leroy Mayes was not there that night.

On cross-examination by Mayes' counsel, Mary testified that Leroy Mayes was present that night when all the men left, along with Charles McKinney. Then she testified on cross-examination that she did not see Leroy Mayes at or just before 6:00 o'clock, but that the last time she saw him was about 3:30 p. m. that day, and "Q. With reference to Charles McKinney, I'm asking you whether or not you're positive or whether or not you know whether this young man was in your home on the evening of December 4th, 1968, somewhere between five-thirty and six-thirty p. m., do you know? A. No, he wasn't there." With respect to her testimony in the trial of one of the other men, Mary was asked, "Do you recall testifying that Charles McKinney was not among the group of fellows in your house on that date? A. Come to think of it, I think he was."

At this point the state asked permission to treat Mary Jones as a hostile witness on the ground that she had given statements to the officers that at about 6:00 o'clock Roy, Berry, Tate, McKinney and Fair were at her house and left, taking the shot-

gun with them; that Mayes could have been at her house, but she did not know; and that in another trial she testified that at the time the planning took place and afterwards both Mayes and McKinney were present. The court ruled that, in view of Mary's conflicting statements, the state was entitled to cross-examination. On further examination by the state Mary testified that she remembered telling the police officers that McKinney was there when the robbery was planned, and that she remembered giving counsel for the state a statement in which she told him that Charles McKinney was there at her house, and that she was telling the truth. On the further examination, she testified she was sure that Charles McKinney was there when the holdup was planned. On further cross-examination by Mayes' counsel, Mary acknowledged that on "direct" examination she testified that McKinney was not there, but on thinking back he was there, but she was not sure that he came back after the holdup. She further acknowledged that she testified that McKinney was not there, a different fact than she maintained on this trial.

Verbie West testified on direct examination for the state that she lived at 2339a Madison on December 4, 1968, when at about 6:30 p. m. McKinney, Mayes and Fair and some others came to her house. At the time they came up with a rifle or a shotgun, but she was not sure which one had it. "Q. Are you sure McKinney didn't have it, are you positive? A. To my knowledge, he didn't; but I'm not sure." The state was then permitted to ask Verbie if she had not given a statement to counsel that she thought McKinney had the gun, "if I'm not mistaken." "Q. With that to refresh your recollection, do you recall in your mind what occurred? Can you tell me now to the best of your recollection who had this shotgun on December 4th, when they came to your house? A. If I remember correct, Charles McKinney had it." On cross-examination by Mayes' counsel, Verbie testi-

fied that she thought Charles had the shotgun, but she was not positive.

Lieutenant Ernest Troupe testified that he took a statement from Mayes, before which he was advised of his rights, using a card to do so. Mayes read the card form, said he understood, did not request a lawyer, and stated he would answer Troupe's questions. No promises or threats were made to Mayes. Mayes denied that he was advised of his rights. After the hearing on the matter outside the hearing of the jury, the court found the statement was voluntary and that the Miranda warnings were given. Detective James Dowd advised McKinney of his Miranda rights before he was interrogated by Detective James King, and McKinney stated he understood his rights and wanted to make a statement relative to the Lograsso case. McKinney himself acknowledged that he was advised of his rights by Officer Oscar Farmer shortly after his arrest. The court likewise found McKinney's statement was voluntarily made.

Before the jury, Troupe testified that Mayes told him he and several other Negroes went to Mary Jones' house and discussed robbing Lograsso. Mayes stood outside the restaurant as a lookout while four others went inside. He heard a shot, and returned to the house. Walter Berry came in shortly and they split the money, Mayes getting three dollars as his part. Dowd testified that McKinney stated he was in on the robbery planning, divided the loot, but remained outside the restaurant while the other four went in.

■ Asking for a new trial on the basis of newly discovered evidence since this appeal, appellant Mayes says that Walter Berry, who was in the penitentiary prior to trial, signed an affidavit that Mayes had nothing to do with the robbery. Berry had pleading guilty to killing Lograsso. He says he could not have approached Berry prior to trial because he was then in the penitentiary.

Mayes says in his brief that the newly discovered evidence did not come to counsel's attention until October 6, 1970, after the motion for new trial was overruled on May 5, 1970. The judgment is of course final, and this court will not consider the ground for the first time raised here, nor follow the novel suggestion that the case should be remanded for the trial court to consider the same. See State v. Johnson, Mo., 286 S.W.2d 787, 795[21]; State v. Worley, Mo., 353 S.W.2d 589, 596[12]. Appellant Mayes' separate point as to this matter is overruled.

■ Both appellants say that the court erred in permitting the state to examine Mary Jones as to her prior statements given to the police officers and to the prosecutor. But both misconceive the facts as to what happened at the trial with respect to the *order* of Mary's examination. They say that the state's examination of Mary was an impermissible impeachment of her testimony under such cases as State v. Burks, 132 Mo. 363, 34 S.W. 48, and State v. Hogan, 352 Mo. 379, 177 S.W.2d 465. See also Douglas v. Alabama, 380 U.S. 415, 419, 85 S.Ct. 1074, 13 L.Ed.2d 934, State v. Drummins, 274 Mo. 632, 647, 204 S.W. 271, 276, and State v. Gordon, Mo., 391 S.W.2d 346, 349, condemning the practice of impeaching one's own witness by the use of prior statements made by the witness. These cases, however, are not applicable to the state's *redirect examination* of Mary Jones. As noted, Mary gave testimony on cross-examination which was contradictory to her direct examination, as above appears. The state was not impeaching its own witness. "On redirect examination a witness may properly be interrogated as to facts, circumstances, or any matter tending to refute, weaken, or remove inferences, impressions, implications, or suggestions which might result from testimony or inquiries on cross-examination, although the facts brought out may be prejudicial to the other party. * * * Where there is a real or apparent inconsistency in the testimony of a witness, he may be questioned on redirect examination to straighten out the inconsistency, and for this purpose he may be asked questions tending to refresh his memory, such as whether or not he made certain statements before the trial. * * *." 98 C.J.S. Witnesses § 419c, d, pp. 223, 224. See also 58 Am.Jur. Witnesses, § 562, p. 314; and the civil cases of Couch v. St. Louis Public Service Co., Mo.App., 173 S.W.2d 617, 623[7–9]; and Cooley v. St. Louis Public Service Co., Mo.App., 236 S.W.2d 31, 35[3]. The Couch case says that the matter of permitting redirect examination rests largely in the discretion of the court. Under the circumstances and the foregoing authority the redirect examination of Mary Jones was not improper, and of course there was no abuse of the court's discretion in permitting it.

■ The cross-examination of witness Verbie West by the state occurred during the state's direct examination of her. The Burks, Hogan and Gordon cases above may be distinguished by reason of the apparent fact that Verbie's testimony was equivocal, uncertain or evasive. The reference to Verbie's statement was specifically made to refresh her obviously faulty recollection, a permissible purpose. 98 C.J.S. Witnesses § 578b, pp. 538, 539; State v. Renfro, Mo., 408 S.W.2d 57, 59[1]; and State v. Patton, 255 Mo. 245, 164 S.W. 223, 225[4, 5]. No error appears by reason of the examination of Verbie West of which only McKinney complains.

■ McKinney says the court erred in admitting in evidence testimony of police officers covering admissions he had made to them. He says his own testimony showed that the admissions were not voluntarily made. The record shows that McKinney was fully advised of his rights according to the requirements of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Thereafter he stated he understood the same and wanted to make a statement. The court, therefore, did not err in admitting the testimony of the police

officers, and by Instruction No. 6 the jury was fully advised as to the fact issue of voluntariness of the admissions.

 Prejudicial error is claimed by McKinney by reason of the state's closing argument about the prevalence of crime in the community—that there were 285 homicides committed in the City of St. Louis during 1969; that every citizen was in fear of his life; and other inflammatory remarks. He says there was no evidence that he was charged with any crime in 1969, and in fact he was in jail all that year. State v. Tiedt, 357 Mo. 115, 206 S.W.2d 524, cited by McKinney, had to do with deterrence of future acts of the defendant himself if he were convicted, and thus is to be distinguished. The matter of law enforcement, the prevalence of crime in the community, the personal safety of inhabitants of the city, and the jury's duty to uphold the law and to draw inferences from its failure to do so, have long been held to be subjects of legitimate argument by the state. See State v. Elbert, Mo., 438 S.W.2d 164, 166[4], and cases cited. Nor is it necessary that such arguments have support in the evidence. State v. Cheatham, Mo., 340 S.W.2d 16, 20[11, 12]. The reference to "black people and white people and decent people and murderers" claimed to be inflammatory was this portion of the state's argument: "* * * but this you can do, is to say to Mike Lograsso and the people of this community he isn't going to die like a dog and cast his life aside by these two men or anyone like them. This is a human being and despite Mr. Crawford's efforts, this isn't an argument between black people and white people, it's between decent people and murderers and it's up to you, the citizens of this community, to say by your verdict—there were two hundred and eight-five murders last year—[Objection overruled] that the citizens of this community are going to have a right to live—." It is clear that the state's argument had nothing to do with a race issue as a reason for conviction, but with the matter of conviction under the facts which the state had a right to urge.

 Witness Claude Johnson at one place described State's Exhibit 6 as a sawed-off shotgun. It appears that the exhibit was a full-length shotgun. McKinney says that the court should have excluded the exhibit because of Claude's description. There was no objection to Claude's testimony, and the matter is therefore not preserved for review. State v. Lovelace, Mo., 461 S.W.2d 733, 735[1].

The judgments are affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM:

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.