STATE of Missouri, Plaintiff-Respondent,

v.

Donald Garfield COX,
Defendant-Appellant.

No. 36903.

Missouri Court of Appeals,
St. Louis District,
Division Three.

Aug. 10, 1976.

Motion for Rehearing and for Transfer to Supreme Court Denied Sept. 30, 1976.

Application to Transfer Denied
Nov. 8, 1976.

**42**

William Shaw, Public Defender, Richard L. Rodemeyer, Asst. Public Defender, Clayton, for defendant-appellant.

Courtney Goodman, Jr., Pros. Atty., and Frank J. Kaveney, Asst. Pros. Atty., Clayton, John C. Danforth, Atty. Gen., Preston Dean, Paul Otto, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

SIMEONE, Presiding Judge.

Defendant-appellant, Donald Garfield Cox, was charged, tried and found guilty by a jury of murder in the first degree and sentenced by the court to life imprisonment. § 559.010, RSMo 1969. He appeals. On this appeal he raises two contentions: that the trial court erred (1) in permitting the state on redirect examination to interrogate a state's witness concerning prior statements which were consistent with direct examination but inconsistent with statements made on cross-examination, and (2) in precluding the defendant from testifying as to his "movements and location" on the day of the alleged murder for the reason that the defendant or his counsel did not comply with an order to disclose a defense of alibi. Rule 25.34(A)(5). For reasons hereinafter stated, we affirm the judgment of conviction.

On December 27, 1973, Mr. Edward Meixner was killed. The appellant, Donald Cox, was arrested for the murder on the evening of December 27, 1973, later released and then rearrested on February 17, 1974, for the offense. On March 18, 1974, he was indicted but was subsequently charged by information in lieu of indictment with two prior convictions and with the murder of Meixner. The information charged that defendant Cox assaulted Meixner with a "board, bottle and knife" and that the victim died therefrom.

Prior to trial, the state, on July 15, 1974, filed its motion to produce and requested among other matters:

"The names and addresses of witnesses to any alibi defense as well as the location of such alibi defense. Rule 25.-34(A)(5). Said alibi defense is in regard to an alleged incident which occurred on December 27, 1973 . . . between the hours of 9:00 a. m., and 3:39 P.M. Rule 25.34(A)(5)."

The motion was sustained. On September 27, 1974, defendant's answer to the state's request for disclosure was filed, which read in pertinent part as follows:

"5(a) Any intent of the Defendant to rely on the defense of alibi: Yes.

"5(b) Location where Defendant claims to have been: Location uncertain.

"5(c) Names and addresses of any witnesses to establish said alibi: None other than all State's witnesses."

Apparently not satisfied with this response, the state moved to compel defendant to notify the state and the court "of any intent to rely on the defense of alibi and the location where the Defendant claims to have been and the names and addresses of any witnesses to establish said alibi . . .." This motion was also sustained. In response, defense counsel, on November 22, 1974, forwarded a letter to the prosecutor which stated:

"This is notification that the defense *may* assert that Defendant was not present at the scene of the crime when it occurred. His location is uncertain. Other than the Defendant, should he testify, I have no witnesses or addresses to give you." (Emphasis added.)

Trial was held in December, 1974. The jury could reasonably find the following facts.

Mr. Meixner lived in a "shack" in a wooded area in Berkeley, St. Louis County. He had been known to be a heavy drinker. On the morning of December 27, 1973, Mr. Meixner was driven to the home of his friend, Roger Melton, who lived a few blocks away from the deceased. When he came to Melton's home, Meixner "was

carrying a bottle and drinking . . .." "[H]e wasn't loaded but he was getting that way pretty fast . . .." After a little while, Melton and Meixner drove to Meixner's house in Melton's car and "drove right in the drive-way or in the yard, more or less." On the way to Meixner's house they saw a pickup truck in which were Jack Hall and the appellant, Donald Cox. Hall and Cox, also acquaintances of Meixner, pulled into the Meixner driveway. Hall and Cox "got out of the pickup truck and got in the back of my [Melton's] car." Melton was in the driver's seat, Meixner was in the front passenger's seat, Hall was sitting behind Melton and Cox behind Meixner. They all sat there drinking. There was some discussion about going to a tavern in Pine Lawn. According to Mr. Melton, "Cox said, will you [Meixner] pay for the drinks when we get down there?" Meixner "said, yes, I've got the stuff to do it with." With that, Melton testified that "Ed [Meixner] was pulling something out of his pocket and putting his hand back in his pocket. . ." According to Jack Hall, when Cox asked Meixner if he would buy, "Ed says 'Yes' . . . he had a little bit of money folded, you know, green, folded in a thing like that, and when he pulled it out Don [appellant] kind of raised up in the seat . . .." Hall saw the money and saw "Don raise up and look just like that at the money."[1] Eventually, Hall and the appellant left in the pickup truck. And Meixner left the Melton automobile and went into his house. Melton waited until Meixner got into the house, "decided to go in and see if he was all right and he was sitting in a chair with his head over on the cot and I [Melton] asked him if he was all right and he said, yes, and so I put a little wood in the stove and turned around and went home."

Prior to the events of the morning of December 27, 1973, and before Messrs. Hall and Cox met Melton and Meixner at Meixner's driveway, Hall and Cox had been at a tavern that night until about 2:00 a. m. At about 2:00 a. m., early in the morning of the

---

1. Mr. Meixner, on occasion, worked part-time for Mr. Robert Overy as a cement mixer, and two weeks before his death Mr. Overy paid him $115.00 in cash for his services.

27th, the two men went to the home of Barbara Finley, a friend of Cox's, who resided on Springdale Ave. Hall went to bed there, but Cox and Barbara Finley sat up "talking." About 7:00 a. m. Hall and Cox left the Finley home, "took a ride over through Ferguson" and that is when they met Melton and Meixner in Meixner's driveway. They sat there and drank "maybe forty-five . . . minutes and then we took Don [Cox] to Springdale [Barbara Finley's home]." Hall left Cox off and "went to Smith Brothers Junk Yard." "That was about 9:30 or 10:00." When Cox returned to Barbara's home, according to Barbara Finley, "[h]e asked me for the butcher knife." She told him it was "underneath the mattress, under my. bed." After he asked for the knife "[h]e stuck it in his pants and went out the door." At the time, he was wearing a blue jean jacket and boots. When he left Barbara's home, she saw him go "across and down the street across Midway."[2]

Sometime later, Cox returned to Barbara's home. On direct examination Barbara Finley testified that when Cox returned she heard him tell her teen-age daughter, Brenda, to "wash his clothes or something." He came in "my front room and sat in the chair." When he returned, Barbara noticed blood on his boots and "a spot of blood" on the pocket flap and sleeve of his jacket. He was then a "lot drunker." He went to the chair and fell asleep.

█ On direct examination Barbara Finley was interrogated about the butcher knife found at the scene of the murder. She said, "It looks like it. . . . It looks like it. Can't tell too much."[3]

She was extensively cross-examined concerning the knife and other matters. She indicated that she bought a knife some two weeks before Christmas at National food stores. The knife introduced as an exhibit had "lines or stripes horizontally" on the blade [8¼″ × 1¼″] but she did not know whether the knife she purchased had such stripes. "[The knife] looks like my butcher knife, but I don't know what it had on it." She also indicated that her knife had the word "Hickory" on it, but the exhibit did not, and that her knife was a new knife but the exhibit did not look like a new knife. On cross examination also, she was unsure whether she saw Cox take the knife and put in it his trousers.

After the extensive cross-examination, the prosecutor claimed "surprise" and requested permission to cross-examine her and show prior consistent statements that she had made on videotape in February, 1974, and in a statement made to him earlier. Defense counsel objected on the ground that he had, prior to Barbara's testimony, informed the prosecutor that she would not be able to identify the knife on direct so that the prosecutor could not claim "surprise."[4] During the colloquy, outside the hearing of the jury, the court stated:

"He [the prosecutor] doesn't have to claim surprise to rehabilitate her [Barbara] with a prior consistent statement. Perhaps he's using the wrong terminology by using surprise as far as he can rehabilitate her with a prior consistent statement."

The court therefore ruled that the prosecutor could interrogate Barbara Finley concerning (a) "[w]hether it is or is not her knife," and (b) whether "she saw him take

---

2. A witness for the state, an elderly lady, testified that she was watching television about 11:00 a. m. and saw a man with "blond, burnt blondish looking color" hair wearing a blue jean jacket walk past her window, walking in the direction of Meixner's shack—"[t]owards the woods."

3. A positive identification is not essential. It is sufficient for purposes of admissibility if the identification of an object is a qualified one. State v. Alderman, 498 S.W.2d 69, 72 (Mo.App.

1973); State v. Johnson, 286 S.W.2d 787, 791 (Mo.1956)—weapon " 'looked like' . . . looked 'very much' like . . ."; State v. Stancliff, 467 S.W.2d 26, 30 (Mo.1971); State v. Russ, 537 S.W.2d 216 (Mo.App.1976).

4. Prior to Barbara's testimony the prosecutor informed the court on the morning of the trial that her testimony would be consistent with her prior statements concerning the knife.

the knife from the mattress and put it in his pants," and whether he left with the knife.

On redirect examination, the prosecutor then brought out that Barbara had made a videotaped statement to the police in February, 1974, in which she stated that the knife was her knife—" 'Yes sir, I'm pretty sure it is my knife' "—and that the exhibit was the knife shown to her in the videotaped statement. She also stated on the videotape that " 'Don asked me where the butcher knife was. He wanted it for something. And I told him it was underneath the mattress on my bed. He got [it], and stuck it down the front of his pants, and then he went out the front door.' " The prosecutor also brought out that in a statement made to him she stated, " 'Yes sir, I'm pretty sure it is my knife.' "

One of the witnesses for the state was Barbara Finley's young daughter—Brenda. Brenda elaborated on the incidents of December 27. On that date she lived with her mother, Barbara. When she awoke, Hall and Cox were in the house. She obtained a bottle of "whiskey or something," gave it to Don and went back to bed. Later, she saw Cox get out of Hall's truck and go to the neighbor's next door, Norma Johnson, and then come back to the Finley home. She heard Cox ask her mother for the knife and saw him lift up the mattress and put his hand under it but did not see him actually get the knife because she ran to Norma's. She was with her mother when she purchased the knife some two weeks earlier. When shown the exhibit, she recognized it as "[o]ur knife." While she was at Norma's she saw Cox walking "[d]own towards these houses here." When he returned to the Finley home, he told her that he had gone down the street and "stabbed some kid or hoodlum." He asked her to wash his clothes or he would "beat" her. She washed his shirt and trousers in the bathtub. As she put the pants in the tub she saw "[s]omething red on his pants." On cross-examination, she persisted that the knife introduced as an exhibit was the knife purchased by her mother.

Late in the afternoon on December 27, 1973, Mr. Melton returned to Meixner's home to "check on Ed." When he arrived, Meixner was "face down on the floor in a pool of blood." There were two gashes on the left side of his head and blood was "gushing out." He was breathing, and Melton placed a coat under his head. Nearby, there was a root beer bottle and glass. Melton told a boy who was with him to "run and get some help." Officer Benjamin Comeau came to the Meixner home, found Meixner lying on the floor and found a board (approximately one inch by four inches by forty-two inches), a bottle and a knife at the scene. The officer attempted to take the victim's pulse but could not feel one. He ordered an ambulance and went to the hospital with the victim. He was present when the hospital physician examined Meixner. He was dead on arrival.

An autopsy was performed. The victim was found to have type "O" blood. There were full lacerations on the face and scalp and a long transverse laceration on the forehead—a gaping cut on the forehead—which was the major wound. The cause of death was a "skull fracture and the contusion to the brain." The autopsy also showed that Meixner was stabbed. The stab wound, almost at a straight angle, measured seven inches. The doctor who performed the autopsy testified that the board "could have been" the object which caused the wound on the forehead, and opined that the knife "would have been the weapon" that caused the chest wound.

After Officer Comeau left the Meixner home, other investigative officers came. Officer Terrence Carty came and found, among other things, the board, knife and some fragments of glass on the floor. He dusted for fingerprints but with negative results. He took the board, knife and some fragments of glass found in the general area of the doorway.

At about 5:30 p. m. on December 27, police officers then went to the Finley home and found Cox. He was sleeping and was undressed except for his shorts. When Bar-

bara went to get his trousers, one of the officers heard Cox say that they were wet, so that he did not wear the light blue trousers to the station. Barbara Finley testified that at about 5:30 p. m. the officers came to her home. Cox was undressed and Barbara went to get him some clothes. She got his "light blue" trousers, but Cox told her "they were wet." "He just said those are wet, get me a different pair. Get rid of them." After the police left, Barbara testified she threw "them in the trash can." Another officer—Officer Gerald Thake—while at the home saw blood on the jacket.

The police took Cox to the police station. At the station that evening, Cox made a videotaped statement after being advised of his rights. In that statement he indicated that he had been drinking the day before with Hall, that they went to Meixner's driveway that morning and sat in the car with Melton and Meixner, drank and joked, left and went to Barbara's, and he, Cox, went to bed. He had known Meixner for four or five years. When asked to explain the blood on his clothing and shoes, he stated that he had had a fight with a man at Shoppers Fair and "kicked him in his head." He explained that that morning he was driving a white Mustang which belonged to a married girlfriend whose name he'd "rather not say" and went to Stone's Drug Store about 8:00 a. m. to buy a "six pack," and upon leaving he had a fight with a man who "kept blowin' his horn." After the videotaped statement, apparently Cox was released, because he was rearrested on February 17, 1974, and taken into custody.

At trial, the state called an employee of a security systems company who testified that Stone's Drug Store's alarm system had not been disengaged until 8:21 a. m. on the morning of December 27th. The state also called an employee of the store who indicated the store does not open until 9:00 a. m. Both Jack Hall and Barbara Finley testified that they did not see Cox drive a white Mustang that day.

■ The state also introduced extensive expert testimony which tended to prove that (1) Cox had type "A" blood, and Meixner had type "O" blood, (2) Cox's jacket had type "O" blood on it,[5] (3) type "O" blood was found on Cox's shoe laces, (4) inside the right boot were found two small pieces of glass which had the same density and refractive index as a piece of glass found in the Meixner house, (5) type "O" blood was found on the knife and board, (6) a glass fragment was found "adhering to the mud on [Cox's] right boot," and (7) neutron activation analysis performed at the University of Missouri indicated that the glass found on the boot and glass found in Meixner's house were from a "common origin."[6]

After the state rested its case and after the court recessed for the day, the court addressed Mr. Cox. The judge informed him that it was his decision whether to take the stand, but advised him that in the event "you do" the prosecutor has "every right to bring out on cross-examination concerning your two prior convictions" for robbery and burglary for which he was sentenced to six and five years respectively. He advised him that he had a right not to testify and that no comment may be made on his failure to testify. Mr. Cox indicated that he did not wish to testify and that it was a combined decision of himself and his attorney.

A discussion then ensued concerning failure to comply with the state's motion to produce an alibi defense. The prosecutor then "suggest[ed] that in view of last week's ruling concerning the extent of his [Cox] testimony . . . since Defendant supplied the Prosecuting Attorney with no location or alibi location, that the Court's ruling . . . was that he would not be allowed to testify that he was anywhere .

---

**5.** Somewhere between 45% to 50% of the population has type "O" blood.

**6.** Neutron activation analysis has been recognized as an accurate, accepted method of determining the elemental composition of a sample. *State v. Ross*, 523 S.W.2d 841, 845 (Mo.App. 1975); *State v. Johnson*, 539 S.W.2d 493 (Mo. App.1976).

else on that day, is that correct?"[7] The prosecutor raised the point concerning the court's earlier ruling to "make sure" Cox was aware of the ruling in making his decision not to testify. The court inquired of Cox whether he was aware that his counsel filed a statement "to the effect that perhaps you were elsewhere at the time this occurred. . . ." Cox replied that he was.

The next day in chambers and before the instructions were read, the discussion concerning the motion to produce continued. The court stated that after the motion to produce was sustained, there was a hearing in chambers and the defendant was ordered, through counsel, to give the names and addresses of any and all alibi witnesses. Cox was advised of this order. As a result of this order, defense counsel wrote the letter of November 22, 1974, which indicated that the defense "may" assert the defendant was not present at the scene of the crime.

In the colloquy, the court addressed Mr. Cox: "Mr. Cox, I understand at this time that you have decided that you are not going to testify in your own defense, is that correct, sir?" He replied, "Yes, sir." "Is that your decision based solely or partly on that Order?" Cox replied: "Under the advisement of my attorney sir." But counsel added: "Your Honor, on the basis of the Order to Produce particular places where he was."

The court then inquired whether counsel would reveal the name of the married woman who owned the white Mustang. Defense counsel replied that "with great respect . . . it is my opinion that this is a very circumstantial [sic] question of the law and [the prosecutor] would like to have it tested and so would I."

The court then stated that "I don't think . . . you can say I was with some person on such and such a date and know that person's name and address, but we are not going to give it to you. . . ." The court again informed Mr. Cox that he had a right to testify and that "other than your specific location and the person you were with you would be free to testify to anything else that took place on that day. . . ." Hence, in effect, the court indicated that since the defendant did not comply with the order to produce the alibi defense, the defendant was precluded from testifying only as to any specific location where he may have been on the date of the murder and as to the person he was allegedly with on that date.

The colloquy in chambers concluded with the following:

"THE COURT: So it is your decision not to testify, is that correct?

MR. COX: Yes, I understand. Under the advisement of my attorney, no, I do not wish to testify."

The defendant did not testify. The case was concluded. Instructions were read and the cause argued. During the argument the prosecutor and defense counsel, among other matters, argued Barbara Finley's testimony concerning the knife.[8] The jury deliberated and found the defendant guilty

---

7. These in-chamber references refer to a ruling by the trial judge which apparently adjudged that the defendant's supplemental letter with reference to the alibi was not in compliance with the state's motion to produce and ordered that the scope of an alibi defense be restricted. This ruling is not a part of the record, but the reference by the prosecutor makes it clear that this was the gist of the ruling.

8. The prosecutor twice referred to Barbara's testimony and her prior statements in closing argument: (a) ". . . Now you people have to judge when Barbara Finley is telling the truth, and when she isn't. You could see her testify, and that statement was brought up, her later statement in contrast to her original statement. . . ." (b) ". . . The next thing, Cox asks for the butcher knife. Barbara Finley of course, on direct examination says, yes, she saw him reach under the mattress and stick it down his trousers and under his coat and walk out the door and then she started to flutter a little bit and then we brought in the video tape statement . . . . It's up to you, ladies and gentlemen, whether you believe she was telling the truth, hedging around the knife with the word hickory on it and all this. . . ."

of murder in the first degree. In due time a motion for new trial was filed.

After the motion for new trial was overruled and allocution given, the court sentenced the defendant to life imprisonment.

■ On this appeal, appellant-Cox makes two contentions. He contends that the court erred in (1) permitting the prosecutor on redirect examination to "impeach" Barbara Finley by the use of her prior statements concerning the identification of the knife because such statements were hearsay and in permitting the prosecutor to argue extrajudicial statements to the jury as "substantive evidence," [9] and (2) excluding testimony by the defendant as to his "movements and location" on the day of the alleged murder because defendant was (a) foreclosed from explaining his innocence in any "convincing and detailed way to the jury," and (b) unable to take the witness stand in any effective manner and hence was unable to testify.

■ As to the first contention, he argues that the law of Missouri is that a party is not permitted to impeach his own witness unless "surprised" by his witness' testimony and unless that witness in effect becomes a witness for the adverse side. This is, of course, the general principle of law. *State v. Woodard,* supra, 499 S.W.2d at 563, and *State v. Davis,* (No. 36,768, Mo.App., St.L. Dist., June 15, 1976).

The principle "thoughtfully established" was clearly enunciated in *State v. Drummins,* 274 Mo. 632, 204 S.W. 271, 276 (1918):

" . . . We held in the case of *State v. Bowen,* 263 Mo. [279] loc. cit. 280, 172 S.W. 367, that it is not sufficient to warrant a party who puts a witness on the stand, in impeaching such witness (by showing extrajudicial statements contradictory of the testimony of the witness upon the stand), that the witness merely fails or refuses to tell the facts which he had theretofore related extrajudicially or

fails to tell all of such facts, but, in order to warrant impeachment in the mode stated, the witness must go further, and by relating wholly contradictory facts become in effect a witness for the adverse side. In the latter event the party calling the witness is entitled to show that he was misled and entrapped by the witness' former words and attitude into calling the adverse witness. . . ."

Quoted in *State v. Woodard,* supra, 499 S.W.2d at 563 and citing *State v. Castino,* 264 S.W.2d 372 (Mo.1954); *State v. Gregory,* 339 Mo. 133, 96 S.W.2d 47 (1936); *State v. Kinne,* supra, 372 S.W.2d 62, and *State v. Gordon,* supra, 391 S.W.2d 346.

■ But these principles are not applicable here and are not dispositive of this issue. Here the prosecutor, prior to the testimony of Barbara Finley, expressed to the court that he had reason to believe that she would testify on the stand in a manner consistent with her prior statements on videotape and consistent with statements made to him before the trial. During her direct testimony she testified as expected by the prosecutor. It was not until cross-examination that she raised doubts about her direct testimony as to the knife and Cox's actions. It was then that the prosecutor was permitted, on redirect, to examine her regarding her prior consistent statements. This method of redirect examination is permissible and is within the principle that:

" 'On redirect examination a witness may properly be interrogated as to facts, circumstances, or any matter tending to refute, weaken, or remove inferences, impressions, implications, or suggestions which might result from testimony or inquiries on cross-examination, although the facts brought out may be prejudicial to the other party. * * * Where there is a real or apparent inconsistency in the testimony of a witness, he may be questioned on redirect examination to

9. He relies on *State v. Kinne,* 372 S.W.2d 62 (Mo.1963); *Crabtree v. Kurn,* 351 Mo. 628, 173 S.W.2d 851 (Mo.1943); *State v. Hogan,* 352 Mo. 379, 177 S.W.2d 465 (Mo.1944); *State v. Woodard,* 499 S.W.2d 553 (Mo.App.1973);

*State v. Granberry,* 491 S.W.2d 528 (Mo. banc 1973) [impeaching evidence cannot be used as substantive evidence]; *State v. Gordon,* 391 S.W.2d 346, 349 (Mo.1965).

straighten out the inconsistency, and for this purpose he may be asked questions tending to refresh his memory, such as whether or not he made certain statements before the trial. * * * .' . . . " *State v. McKinney,* 475 S.W.2d 51, 54 (Mo.1971).[10]

See cases collected in Annot., 75 A.L.R.2d 909, 933 (1961); *State v. Earvin,* 539 S.W.2d 615 (Mo.App.1976), and cases cited therein. As the trial judge stated, a party is not required to claim surprise to rehabilitate a witness with a prior consistent statement. Prior statements affecting credibility are not inadmissible because they are hearsay. *State v. Davis,* supra, (No. 36,768).

Appellant also contends that (1) the extrajudicial statements of Barbara Finley were used as substantive evidence and as such were not competent under the authority of *State v. Granberry,* supra, and (2) although not preserved for review, the prosecutor argued these statements as substantive evidence and hence violated the "orthodox" rule that impeaching evidence is not competent as substantive evidence of the facts to which such statements relate. See *State v. Granberry,* supra, 491 S.W.2d at 530.

▉▉▉▉ We reject both of these contentions. First, the prior consistent statements of Barbara Finley brought out on redirect examination were not used as substantive evidence but were admitted to refute the impressions and implications which may have resulted from her testimony on cross-examination. And, second, appellant's contention that the comments of the prosecutor in closing argument constituted substantive evidence was not properly preserved for review. Error, if any, was certainly not "plain error." *State v. Meiers,* 412 S.W.2d 478, 480–481 (Mo.1967).[11] The prosecutor,

on closing argument, may comment on the evidence and the credibility of witnesses. Matters concerning argument must to a large degree rest within the sound discretion of the trial court. *State v. Sallee,* 436 S.W.2d 246, 254 (Mo.1969).

We therefore rule appellant's first point against him.

As to appellant's second point—that the court erred in restricting his testimony concerning his movements and location on the day of the murder because of his, or his counsel's failure to comply with the recently enacted rules of criminal discovery relating to notice-of-alibi—we are convinced that there was no error in this regard. Appellant contends that by excluding the defendant from explaining his movements and location on the day of the murder he was foreclosed from "explaining his innocence in any convincing and detailed way," was "unable to take the witness stand" and "therefore unable to testify." He argues several matters: (1) the state's motion failed to comply with Rule 25.34(A)(5) because the state did not "specify" the place, date and time of the crime charged but specified a time span of six and one-half hours as the time of the offense; (2) because the accused had not made a definite decision to assert an alibi defense—defense counsel's letter of November 22, 1974 stated that he "may" assert the defense. Hence, appellant argues that he "gratuitously" answered the state's request; (3) the state's motion to produce was made after twenty days after arraignment so that it did not comply with Rule 25.31; (4) Rule 25.-34(A)(5) cannot be interpreted to preclude evidence to be offered by a *defendant,* as distinguished from witnesses, because such information is protected by the attorney-client privilege; and (5) the trial court's order restricting appellant from testifying

---

10. Several of the authorities relied upon by appellant—*State v. Hogan,* supra, and *State v. Gordon,* supra—were held in *State v. McKinney,* supra, to be inapplicable to the state's *redirect examination.*

11. In our opinion, the comments here, unlike *State v. Granberry,* supra, and *State v. Davis,* supra, were not used as substantive evidence to show the truth of the statements made by Barbara Finley but were used to show the consistency of her prior statements and to discredit the impressions and implications raised by her testimony on cross-examination.

as to his location and with whom he was associated violated his constitutional right to present a defense inasmuch as Rule 25.34 explicitly states that discovery rules are "subject to constitutional limitations."

Our new rules of criminal discovery—Rules 25.30–25.45, relating to reciprocal criminal discovery—became effective July 1, 1974.[12] These new rules represent the apogee of pretrial discovery in criminal cases in the history of Missouri. Criminal discovery has had a long and turbulent history,[13] but the modern trend is for liberalizing discovery in criminal cases. Our Rules "promulgate a procedure, within constitutional definition, for mutual pre-trial disclosure between the parties in cases of felony. Their desideratum is a quest for truth which promotes informed pleas, expedited trials, a minimum of surprise and opportunity for effective cross-examination." *State v. Buckner,* 526 S.W.2d 387, 392 (Mo. App. 1975).

Rule 25.34(A)(5) provides that:

"If the defendant intends to rely on the defense of alibi and the state in its motion specifies the place, date and time of the crime charged, disclosure shall be in the form of a written statement by counsel for the defendant, announcing such intent and giving specific information as to the place at which the accused claims to have been at the time of the alleged offense, and . . . the names and addresses of the witnesses by whom he proposes to establish such alibi."

For failure to comply with the Rules, the "court may order such party to make disclosure of material and information not previously disclosed, grant a continuance, *exclude such evidence,* or enter such other orders as it deems just under the circumstances. . . . " Rule 25.45.[14] (Emphasis added.)

The technical arguments and contentions relied upon by appellant are wholly without merit. (1) The state's motion under the circumstances sufficiently specified the place, date and time of the crime charged. The time sequence in this record was not so specific as to indicate the exact moment when Meixner was killed. The state in its motion stated the time of the incident "between the hours of 9:00 a.m., and 3:39 P.M." on December 27, 1973. This was sufficient. Neither party is required to specify the exact second a crime is committed. (2) The contention that because the accused had not made a definite decision to assert an alibi defense but stated that he "may" assert the defense is wholly without merit. Such an equivocal declaration is certainly not within the spirit or letter of the Rule. The Rule contemplates that the defendant be specific as to whether he will or will not assert the defense of alibi. It does not permit equivocation. (3) Although the motion was not made within twenty days after arraignment, the time was implicitly, under the record, extended by the court which is within the authorization of the Rule.

Although the appellant raises the more difficult question—whether the court may exclude or restrict the testimony of a defendant in a criminal case, as distinguished from alibi witnesses when there is a noncompliance with a discovery order under the Rules—we believe, under this record, that it is not essential to reach this issue for the disposition of this appeal.

From a careful examination of the entire record, we are convinced that the appellant did not testify because of strategic, tactical and trial reasons and not because the court restricted his testimony concerning his location and movements on the day of the murder and restricted his testimony concerning

---

12. For a discussion of the Rules, see Simeone, The New Rules of Criminal Discovery in Missouri, 31 J. of Mo. Bar 16 (1975).

13. See A.B.A. Standards Relating to Discovery and Procedure Before Trial, 34–46 (1970).

14. The Federal Rules of Criminal Procedure as amended in 1975, PL 94–64, 94th Congress, provides in Rule 12.1(d) that upon failure to comply with notice of alibi, the court may exclude any undisclosed witness offered by such party, but "[t]his rule shall not limit the right of the defendant to testify in his own behalf."

the identity of the woman he allegedly was with. We believe that appellant knowingly, consciously made a deliberate choice, upon advice of counsel, not to testify because of strategic reasons, and that his contention that his testimony was restricted was merely incidental thereto and was an afterthought. The record shows that, after the state rested, the court advised appellant he did not have to testify but that if he did, the state had "every right to bring out on cross-examination your two . . . prior convictions and there may be more . . . ." Appellant made a conscious choice, based on a "combination of both of your [appellant and counsel] decisions." It was then that the discussion concerning the prior ruling of the court, on restricting the defendant from testifying as to his location and whom he was with, took place. The court specifically inquired:

"Mr. Cox, I understand at this time that you have decided that you are not going to testify in your own defense, is that correct, sir?

MR. COX: Yes sir.

THE COURT: Is that your decision based solely or partly on that Order? [the order to restrict defendant from testifying that he was at a specific place and whom he was with]

MR. COX: A. Under the advisement of my attorney sir.

[Defense Counsel]: Your Honor, on the basis of the Order to Produce particular places where he was.

\* \* \* \* \* \*

THE COURT: Q. Mr. Cox, you have the right to testify . . . [a]nd other than your specific location and the person you were with you would be free to testify to anything else that took place on that day . . . ." [15]

In the posture of this case, we believe that appellant and his counsel determined, for tactical reasons, not to take the stand and that the court's order to restrict his testimony concerning only his location and the woman whom he was allegedly with did not prejudice the appellant as he contends. The order did not, in and of itself, keep appellant off the stand. His two prior convictions loomed large in his decision not to testify. His videotaped statement was presented in which he denied any participation in the crime. The defendant was not precluded by any order of the court from taking the stand altogether; the order of the court was a limited one—it precluded the defendant from testifying only as to his location or movements and the name of a witness whom he claimed to be with. There was no offer of proof as to any alibi; both counsel seemed to desire that the issue of precluding a defendant from testifying be tested. Under these circumstances, it is not essential for the disposition of this case to determine the validity of a restrictive order precluding certain limited testimony by a defendant under Rule 25.45 and whether such preclusion violated the attorney-client privilege or violated his "constitutional" right to present a defense and testify on his own behalf.[16]

Whether or not a failure or refusal to give a notice-of-alibi defense deprives defendant of due process or compels him to be a witness against himself has been explored in *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), and in *Wardius v. Oregon*, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973).

In *Williams v. Florida*, supra, it was held that the application of a notice-of-alibi rule did not deprive defendant of due process or compel him to be a witness against himself. The Supreme Court of the United States held that notice-of-alibi provisions do not

---

15. In the videotaped statement taken on December 27, 1973, the appellant stated he was alone when he went to Stone's Drug Store.

16. The constitutional question was not preserved for review. Appellant did not raise the constitutional argument until the briefing stage. *City of St. Louis v. Butler Co.*, 358 Mo. 1221, 219 S.W.2d 372, 376 (banc 1949); *State v. Goforth*, 535 S.W.2d 464, 468–469 (Mo.App. 1976).

violate either due process or the privilege against self-incrimination.[17]

" . . . Given the ease with which an alibi can be fabricated, the State's interest in protecting itself against an eleventh-hour defense is both obvious and legitimate. Reflecting this interest, notice-of-alibi provisions . . . are now in existence in a substantial number of States. The adversary system of trial is hardly an end to itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played. . . . " *Williams v. Florida,* supra, 90 S.Ct. at 1896.

In *Wardius v. Oregon,* supra, the Court held that an Oregon statute which made no provision for reciprocal discovery and which precluded a criminal defendant from introducing evidence to support an alibi defense as a sanction for failure to comply with a notice-of-alibi rule violates due process. The Court did, however, note that notice-of-alibi rules are based on the proposition that the ends of justice will best be served by a system of liberal discovery which gives both parties the maximum possible amount of information with which to prepare their cases and thereby reduce the possibility of surprise at trial. The growth of such discovery is a salutary development. *Wardius v. Oregon,* supra, 93 S.Ct. at 2211.[18]

Whether a defendant, as distinguished from alibi witnesses, may be precluded from testifying as to an alibi defense if he or his counsel has not previously submitted a notice of alibi as required by rule or statute has been the subject of varying interpretations, and varying rationales.[19] See Annot., 45 A.L.R.3d 958, 987–988 (1972); 30 A.L.R.2d 480 (1953); cf. Note, the Preclusion Sanction—A Violation of the Constitutional Right to Present a Defense, 81 Yale L.J. 1342 (1972).

In the posture of this case and under this record, it is not essential for us to determine which of these varying rules or rationales are applicable, for we are convinced that the limited restrictive order of the trial court was not prejudicial to the rights of the appellant and the matter was not sharpened for proper review.

We therefore rule appellant's second point against him.

We have thoroughly reviewed the entire lengthy transcript, we have read all the authorities relied upon by the appellant and many more, we have thoroughly considered all the issues and contentions relied upon by the appellant, and we are convinced that

17. The Court emphasized that this case does not involve the question of the validity of the threatened sanction had petitioner chosen not to comply with the rule. " . . . Whether and to what extent a State can enforce discovery rules against a defendant who fails to comply, by excluding . . . evidence is a question raising Sixth Amendment issues which we have no occasion to explore. . . . " *Williams v. Florida,* supra, 90 S.Ct. at 1897, note 14.

18. The Court did not rule on the issue whether, if the Oregon rule were valid, it could not be enforced by excluding the defendant's testimony or supporting witnesses. *Wardius v. Oregon,* supra, 93 S.Ct. 2208, 2211, note 4.

19. The weight of authority of the reported decisions supports the trial court's ruling precluding the defendant from testifying as to his location and the name of the witness for failure to comply with a notice-of-alibi rule. Cases holding that the defendant's alibi testimony is subject to exclusion include: *State v. Francis,* 128 N.J.Super. 346, 320 A.2d 173, 175 (1974); *State v. Wardius,* 6 Or.App. 391, 487 P.2d 1380, 1382 (1971), rev'd on other grounds, *Wardius v. Oregon,* supra; *Johns v. Perini,* 440 F.2d 577, 579 (6th Cir. 1971); *Lake v. State,* 274 N.E.2d 249, 252–253 (Ind.1971); *State ex rel. Simos v. Burke,* 41 Wis.2d 129, 163 N.W.2d 177, 179–182 (1968); *State v. Taylor,* 198 Kan. 290, 424 P.2d 612, 618 (1967); *State v. Rider,* 194 Kan. 398, 399 P.2d 564, 567 (1965); *Rider v. Crouse,* 357 F.2d 317, 318 (10th Cir. 1966).

Cases holding that the defendant's testimony cannot be excluded include: *People v. Merritt,* 396 Mich. 67, 238 N.W.2d 31, 38–41 (1976); *State ex rel. Mitchell v. Walker,* 294 So.2d 124, 126 (Fla.App.1974)—under specific statute; *State v. Stump,* 254 Iowa 1181, 119 N.W.2d 210, 218 (1963); *State v. Post,* 255 Iowa 573, 123 N.W.2d 11, 18–19 (1963); *People v. Rakiec,* 289 N.Y. 306, 45 N.E.2d 812, 814 (1942).

there was no prejudicial error requiring a reversal of the judgment and a re-trial.

The judgment is affirmed.

KELLY and GUNN, JJ., concur.